UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LOGAN M. GRIMES, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 6091 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| COUNTY OF COOK, an Illinois county, d/b/a COOK COUNTY HEALTH & HOSPITALS SYSTEM and/or CERMAK HEALTH SERVICES, and MELVIN JUDKINS, in his individual capacity, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Logan Grimes brought this suit in the Circuit Court of Cook County, Illinois, against his employer, Cook County, and his supervisor, Melvin Judkins, alleging violations of 42 U.S.C. § 1983 and Illinois law. Doc. 1 at pp. 143-182. Defendants removed the suit, *id*. at 1-2, Grimes amended his complaint, Doc. 13, and Defendants move under Civil Rule 12(b)(6) to dismiss the suit, Doc. 18. The motion is denied.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Grimes's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Grimes as those

1

materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). The passages in quotation marks are direct quotations from the operative complaint. In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

Grimes is a transgender person. Doc. 13 at p. 2, ¶ 4. Transgender means "of, relating to, or being a person whose gender identity differs from the sex the person had or was identified as having at birth." *Ibid*. (internal quotation marks and citation omitted). At birth, Grimes's "designated sex … was female." *Ibid*. Around 2000, when he was 37 years old, Grimes was diagnosed with a condition then known as gender identity disorder and today known—under the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5")—as gender dysphoria. *Ibid*. Around 2003, Grimes became recognized medically and legally as male. *Id*. at p. 3, ¶ 6. To treat his gender dysphoria, Grimes underwent a series of medical interventions, including testosterone treatment, chest reconstructive surgery, and genital surgeries. *Id*. at p. 2, ¶ 4. Grimes's surgical treatment was completed by 2006, and he continues to undergo testosterone treatment. *Ibid*.

As a result of these medical procedures, Grimes has male pattern baldness, a low voice, a full beard, and a male build. *Id*. at p. 3, ¶ 5. Grimes has presented as "unambiguously male" since at least 2008. *Ibid*. From 2008 to the present, disclosing that Grimes is transgender would be tantamount to disclosing that he had gender dysphoria and that he had undergone significant medical intervention given that: "(1) no one could look or sound like [Grimes] whose designated sex at birth was female without significant medical interventions, (2) the combination of surgeries which [he] [underwent] were available only to persons diagnosed with … gender

2

dysphoria, and (3) a person does not transition from one sex to the other unless they suffer from gender dysphoria." *Ibid*.

Grimes has sought to keep his transgender status private, disclosing it only to close friends and not to neighbors, acquaintances, or co-workers. *Id*. at p. 3, ¶ 7. When applying for jobs, Grimes did not disclose his transgender status, which he considers confidential medical information. *Ibid*. Grimes was "'living in stealth'"—a term "used to refer to people who are not out to the public about their transgender status." *Id*. at p. 4, ¶ 8.

In February 2013, Grimes began work as a Correctional Medical Technician II at Cook County Jail. *Id*. at p. 2, ¶ 2. Cook County was Grimes's employer and Judkins was his immediate supervisor. *Id*. at p. 2, ¶¶ 2-3. On at least five occasions, Grimes witnessed verbal harassment and degradation of transgender detainees by correctional officers and medical staff. *Id*. at p. 4, ¶ 9. Grimes also is aware of incidents of physical violence toward transgender detainees by correctional officers at the Jail. *Ibid*; Doc. 13-1.

In 2013, after acts of violence were perpetrated against transgender detainees, the Jail placed some transgender detainees in protective custody. Doc. 13 at p. 4, ¶ 10; Doc. 13-1. For the entirety of Grimes's tenure at the Jail, there was a culture of transphobia among Jail employees. Doc. 13 at p. 4, ¶ 11. For example, in August 2018, while speaking with Grimes, a co-worker referred to an individual who presented as female by saying: "'You see that. That's a man. People ought to tell who they really are. That's how people get killed.'" *Id*. at p. 5, ¶ 12.

On September 28, 2018, Judkins told some of Grimes's co-workers that Grimes is transgender and that this was the reason he was no longer assigned to Division Six, which housed transgender detainees. *Id*. at p. 5, ¶ 13. On September 30, 2018, two co-workers who were present when Judkins outed Grimes told Grimes that Judkins had disclosed his transgender

3

status. *Id*. at p. 6, ¶ 15. One co-worker told Grimes she was afraid for his physical safety. *Ibid*. The disclosure of Grimes's status to his co-workers created a significant likelihood of physical violence against him. *Id*. at p. 6, ¶ 16.

Grimes fears for his safety and his family's safety should he continue to work at the Jail. *Id*. at p. 6, ¶ 17. He has been on an unexcused and unpaid leave of absence since September 28, 2018, losing income and retirement benefits he otherwise would have earned. *Ibid*. As a result of Judkins's disclosure of his status, Grimes has lost friends and acquaintances; experienced severe mental and emotional pain and suffering; endured sleepless nights and hypertension; been prescribed hypertensive medication to reduce his blood pressure; and incurred medical expenses. *Ibid*.

## Discussion

### I. Section 1983 Claim

Grimes's § 1983 claim alleges that Judkins violated his right to medical privacy under the Fourteenth Amendment's Due Process Clause. *Id*. at pp. 1-8. A substantive due process claim "is limited to violations of fundamental rights." *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010). The Seventh Circuit has held that one fundamental right is the "right to the privacy of medical, sexual, financial, and perhaps other categories of highly personal information—information that most people are reluctant to disclose to strangers." *Wolfe v. Schaefer*, 619 F.3d 782, 785 (7th Cir. 2010). This "right is defeasible only upon proof of a strong public interest in access to or dissemination of the information." *Ibid*.; *see also Denius v. Dunlap*, 209 F.3d 944, 956 (7th Cir. 2000) ("[T]his Circuit has outlined a clearly established 'substantial' right in the confidentiality of medical information that can only be overcome by a sufficiently strong state interest."). Defendants do not argue that the public interest justified Judkins's disclosure of Grimes's transgender status. Thus, whether Grimes states a medical privacy claim turns on

4

whether he alleges that (1) Judkins disclosed to others (2) his private medical information (3) without his permission.

Grimes plainly satisfies (1) and (3), having alleged that Judkins made a disclosure to others without his permission. Doc. 13 at p. 5, ¶ 13. As for (2), the subject matter of Judkins's disclosure—Grimes's transgender status—qualifies as private medical information. Grimes plausibly alleges that anybody informed of his transgender status would necessarily know of his gender dysphoria and prior medical interventions. *Id.* at pp. 2-3, ¶¶ 4-5. Gender dysphoria is a medical condition under governing precedent, *see Fields v. Smith*, 653 F.3d 550, 555 (7th Cir. 2011) (holding that the condition then known as gender identity disorder was a "serious medical need"); *Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997) (describing a transgender woman's gender dysphoria as a medical condition, the treatment of which required estrogen therapy and surgery), and according to the psychiatric community, *see* American Psychiatric Association ("APA"), Gender Dysphoria 1 (APA 2013), available at https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Gender-Dysphoria.pdf ("In the [DSM-5], people whose gender at birth is contrary to the one they identify with will be diagnosed with gender dysphoria."); *see also McGee v. Bartow*, 593 F.3d 556, 576-77 (7th Cir. 2010) (describing the DSM as a "respected source"). And it is plausible that Grimes's transgender status is private information "that most people are reluctant to disclose to strangers," *Wolfe*, 619 F.3d at 785, as he alleges that many transgender persons go to great lengths to keep their statuses private, Doc. 13 at p. 4, ¶ 8, that he personally went to great lengths to keep his status private, *id.* at pp. 3-4, ¶¶ 7-8, and that he would likely face violence at work as a result of his status being disclosed, *id.* at p. 6, ¶¶ 16-17.

Defendants incorrectly contend that Grimes's § 1983 claim fails because he does not allege "how Judkins accessed [his medical] information." Doc. 18 at 5. Given the complaint's allegation that Judkins made a significant employment-related decision—declining to post Grimes to Division Six, where transgender detainees are held—based on Grimes's transgender status, Doc. 13 at p. 5, ¶ 13, it is reasonable to infer that Judkins learned of Grimes's status not from mere observation, but from a private source like an employee file or Grimes himself. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility [sufficient to survive a motion to dismiss] when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Indeed, at the motion hearing, Doc. 24, Defendants' counsel stated that Judkins had told counsel that he learned of Grimes's transgender status from a prior employment relationship.

Defendants next argue that Grimes has no viable substantive due process claim because Judkins's conduct does not rise to the level of shocking the conscience. Doc. 18 at 5. This argument fails because medical privacy and conscience shocking are separate and independent means of stating a substantive due process claim. *See Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005) (detailing the "shock the conscience" standard). Accordingly, because Grimes alleges facts sufficient to state a medical privacy claim, he need not also satisfy the conscience shocking standard. *See Denius*, 209 F.3d at 956-57 (noting that a plaintiff has a "'substantial' right in the confidentiality of medical information," such that "the release of medical records or communications" is the "type of information [that] has constitutional protection in th[e] [Seventh] Circuit," without mentioning the "shock the conscience" standard).

Finally, Defendants contend that Judkins is entitled to qualified immunity because "an objectively reasonable official in Judkins['s] position would not recognize that … disclosing

[Grimes's] transgender status would violate any substantive due process right." Doc. 18 at 5-7. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. … A state official is protected by qualified immunity unless the plaintiff shows: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (internal quotation marks omitted). "Because a qualified immunity defense so closely depends on the facts of the case, a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Id*. at 548 (internal quotation marks omitted); *see also Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008) ("[W]e have cautioned that the rule that qualified immunity must be resolved at the earliest possible stage must be tempered by the notice pleading requirements of Rule 8.") (internal citations omitted). This general rule is not ironclad, as there is "tension at [the pleading] stage of litigation between developing the requisite facts for a well-informed qualified immunity determination and preserving a government official's right to avoid the burdens of pretrial matters, including discovery." *Reed*, 906 F.3d at 548; *see also Gill v. City of Milwaukee*, 850 F.3d 335, 340-42 (7th Cir. 2017) (affirming a Rule 12(c) dismissal on qualified immunity grounds). The upshot is that a defendant asserting qualified immunity at this stage is subject "to a more challenging standard of review than would apply on summary judgment," and "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for objective legal reasonableness." *Reed*, 906 F.3d at 549 (internal quotation marks omitted).

There is no basis to depart from the general rule here. Grimes alleges that Judkins disclosed his transgender status "maliciously and with reckless disregard to [his] safety and

7

rights," Doc. 13 at p. 5, ¶ 13, and the complaint gives no basis to conclude—and Defendants do not even argue—that a significant government interest justified the disclosure. The law was clearly established by late September 2018, when Judkins made the disclosure, that there is a substantive due process right to medical privacy. *See Denius*, 209 F.3d at 956-57 ("[The] [Seventh] Circuit has outlined a clearly established "substantial" right in the confidentiality of medical information that can only be overcome by a sufficiently strong state interest. Therefore, to the extent that the [disclosure] provided for the release of medical records or communications, [the defendant] was on notice that this type of information has constitutional protection in this Circuit and that the state cannot require its disclosure without a sufficient countervailing interest. As [the defendant] has provided no interest at this stage in the proceedings that would justify requiring [the plaintiff] to supply this information, we find he has not shown that he is entitled to qualified immunity on this issue.") (internal citation and footnote omitted). And it is clear, at least on the pleadings, that Judkins's gender dysphoria was confidential medical information. It follows that Judkins is not entitled to qualified immunity at this stage of the case.

## II.     State Law Claims

### A.     Claims Against Judkins

The complaint brings state common law claims against Judkins for invasion of privacy through public disclosure of private facts and for intentional infliction of emotional distress ("IIED"). Doc. 13 at pp. 8-16.

#### 1.     Invasion of Privacy Claim

To state an invasion of privacy claim for the public disclosure of private facts, a plaintiff must allege facts sufficient to show that "[(1)] private facts [(2)] were made public and [(3)] that the matter made public would be highly offensive to a reasonable person." *Karraker v. Rent-A-Ctr., Inc.*, 411 F.3d 831, 838 (7th Cir. 2005); *see also Wynne v. Loyola Univ. of Chi.*, 741 N.E.2d

669, 676-77 (Ill. App. 2000) (same). As to (1) and (2), the complaint alleges that Grimes's transgender status was a private fact that he did not disclose at work, Doc. 13 at p. 9, ¶¶ 5-6, and that Judkins disclosed his status to his co-workers without his permission, *id.* at p. 10, ¶ 11. As to (3), Defendants do not argue that Judkins's disclosure would not be "highly offensive to a reasonable person," *Karraker*, 411 F.3d at 838, thereby forfeiting the point for purposes of this motion. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted). Accordingly, the complaint states a claim for the public disclosure of private facts. *See Miller v. Motorola, Inc.*, 560 N.E.2d 900, 901 (Ill. App. 1990) (holding that the plaintiff stated a claim for public disclosure of private facts where her employer "disclos[ed] … her mastectomy surgery to [her] co-employees"); *see also Johnson v. K Mart Corp.*, 723 N.E.2d 1192, 1197 (Ill. App. 2000) (same, where the defendant employer used undercover detectives to learn about "employees' family matters, health problems, and sex lives"); *Green v. Chicago Tribune Co.*, 675 N.E.2d 249, 254 (Ill. App. 1996) (same, where the defendant newspaper "publish[ed] a photograph of [the plaintiff's] dead son[,] identif[ied] her as [the] mother[,] and publish[ed] her [hospital room] statements to [her dead son]").

Defendants retort that the complaint admits that Grimes's transgender status was not private, pointing to his allegations that certain co-workers knew of his status before Judkins disclosed it in late September 2018. Doc. 18 at 10. In support, Defendants cite the complaint's allegations that, from May through August 2018, three co-workers harassed Grimes "based upon [his] perceived or actual gender-related identity." Doc. 13 at p. 19, ¶ 11; *id.* at p. 29, ¶ 11.

9

Defendants' argument fails for two reasons. First, the complaint alleges that only three co-workers knew or suspected that Grimes was a transgender man, yielding the permissible inference that his status was not widely known at the Jail. Second, the complaint allows for the inference that those co-workers only "perceived" that Grimes was a transgender man, not that they definitely knew he was, meaning that Judkins's disclosure of his status revealed concrete information that had previously remained private.

### 2. IIED Claim

To state an IIED claim, a plaintiff must allege facts sufficient to show: (1) "conduct [that is] truly extreme and outrageous"; (2) that the defendant "intend[ed] that his conduct inflict severe emotional distress, or know that there [was] at least a high probability that his conduct [would] cause severe emotional distress"; and (3) that "the conduct … in fact cause[d] severe emotional distress." *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) (emphases omitted); *see also Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006) (same). "[T]he nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 83 (Ill. 2003); *see also Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 747 (7th Cir. 2008) (same).

The complaint alleges that "[t]he conduct of [Judkins] in disclosing [Grimes's] transgender status to [his] co-workers was extreme and outrageous, and put [his] life at risk," Doc. 13 at p. 15, ¶ 14; that Judkins acted "maliciously and with reckless disregard to [Grimes's] safety and rights," *id.* at p. 5, ¶ 13; that Judkins "intended [for] his conduct in disclosing [Grimes's] transgender status to [his] co-workers [to] inflict severe emotional distress on [him] or knew that there was a high probability that his … conduct would cause [him] severe emotional distress," *id.* at p. 15, ¶ 15; and that, "[a]s a proximate result of the disclosure," Grimes

10

"reasonably fears for his safety and his family's safety should he continue to report for work," "has lost friends and acquaintances," "experience[d] severe mental and emotional pain and suffering," endured "sleepless nights [and] hypertension," and "require[s] hypertensive medication to reduce [his] blood pressure," *id*. at p. 15, ¶ 16. These allegations suffice to state an IIED claim. *See Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211-13 (Ill. 1992) (holding that the plaintiffs stated an IIED claim where radio show hosts, paid to promote the plaintiffs' fundraiser, "ridiculed" the plaintiffs by denying that they suffered from a severe medical condition and that their fundraising for that condition was a scam, "the complaint allege[d] that the defendants' conduct, in making and broadcasting the statements, was done with reckless disregard of the probability of causing emotional distress," and "the complaint allege[d] … that the plaintiffs suffered severe emotional distress as a proximate result") (internal quotation marks omitted).

### 3. IHRA Preemption

Defendants contend that Grimes's invasion of privacy and IIED claims are preempted by the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq*. Doc. 18 at 8-9. The IHRA makes it a "civil rights violation … [f]or any employer to refuse to hire, to segregate, to engage in harassment … or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination or citizenship status." 775 ILCS 5/2-102(A). The term "[u]nlawful discrimination" includes "discrimination against a person because of his or her … sexual orientation," 775 ILCS 5/1-103(Q), and "[s]exual orientation" is defined to include "actual or perceived … gender-related identity,

11

whether or not traditionally associated with the person's designated sex at birth," 775 ILCS 5/1-103 (O-1).

The IHRA includes this preemption provision: "Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(D). This provision "preempts all state law claims seeking redress for a civil rights violation within the meaning of [the IHRA]." *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000) (alterations and internal quotation marks omitted). At the same time, "where a course of conduct states an independent state law claim, that independent claim is not preempted by the IHRA." *Ibid*. A claim is independent of the IHRA "if the conduct would be actionable even aside from its character as a civil rights violation because the IHRA did not 'furnish[] the legal duty that the defendant was alleged to have breached.'" *Id*. at 516-17 (quoting *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997)); *see also Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006) ("The distinction between claims that are preempted and claims that are not preempted turns on the legal duty that the defendant allegedly breached … ."); *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009) ("[P]laintiff here established a basis for imposing liability on defendants independent of the [IHRA], *i.e.*, without reference to the legal duties created by the [IHRA]."). Thus, whether the IHRA preempts a common law tort claim "depends upon whether the tort claim is *inextricably linked* to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." *Maksimovic*, 687 N.E.2d at 23 (emphasis added).

Under these principles, tort claims are preempted where the only harm to the plaintiff is emotional distress caused by an IHRA violation, *see Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 934 (7th Cir. 2017); *Bannon v. Univ. of Chi.*, 503 F.3d 623, 630 (7th Cir. 2007);

*Quantock v. Shared Mktg. Servs., Inc.*, 312 F.3d 899, 905 (7th Cir. 2002); *Krocka*, 203 F.3d at 517; *Smith v. Chi. Sch. Reform Bd. of Trustees*, 165 F.3d 1142, 1151 (7th Cir. 1999); where the plaintiff alleges that the defendant's actions are against public policy because they violated the IHRA, *see Nelson v. Realty Consulting Servs., Inc.*, 431 F. App'x 502, 507 (7th Cir. 2011); where the plaintiff claims that an IHRA violator's employer is responsible for the employee's violation due to negligent hiring and retention, *see Geise v. Phoenix Co. of Chi.*, 639 N.E.2d 1273, 1277-78 (Ill. 1994); and where the plaintiff alleges that the defendant's interference with a contract was "unjustified or malicious" because it was motivated by unlawful discrimination, *see Welch v. Ill. Sup. Ct.*, 751 N.E.2d 1187, 1197 (Ill. App. 2001). Tort claims are not preempted where conduct in addition to any alleged IHRA violation caused emotional distress, *see Naeem*, 444 F.3d at 605; where an IHRA violation is "merely incidental" to the elements of the tort claim, *see Maksimovic*, 687 N.E.2d at 23; and where the plaintiff relies on public policy other than that embodied in the IHRA to support the tort claim, *see Blount*, 904 N.E.2d at 10.

      These authorities reflect and implement the general rule that the IHRA does not preempt a tort claim if the "claim rests … [on] behavior that would be a tort no matter what the motives of the defendant." *Naeem*, 444 F.3d at 605. Grimes's privacy and IIED claims pass that test because they do not necessarily turn on Judkins having acted with any motive, such as animus towards transgender people, that would be unlawfully discriminatory under the IHRA. *See Karraker*, 411 F.3d at 838 (stating the elements of a public disclosure of private facts claim, none of which require a discriminatory motive that would be unlawful under the IHRA); *McGrath*, 533 N.E.2d at 809 (same, for an IIED claim). Unlike the plaintiff in *Welch*, for example, who alleged that the defendant's actions were wrongful because they were discriminatory, *see* 751 N.E.2d at 1197 ("Because the tortious interference charge cannot stand

13

alone without the improper motivation of conduct prohibited by the Human Rights Act, the claim is inextricably linked to the Human Rights Act, which provides [the plaintiff] with an exclusive remedy."), Grimes alleges that Judkins's actions were wrongful because they invaded his privacy and intentionally caused him emotional distress. Grimes need not delve into Judkins's motives for outing Grimes as transgender to show that his actions were tortious.

### 4. TIA Immunity

Defendants also argue that the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("TIA"), 745 ILCS 10/1-101 *et seq.*, immunizes Judkins from liability for Grimes's common law claims. Doc. 18 at 7. Section 2-202 of the TIA provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202; *see Munizza v. City of Chicago*, 583 N.E.2d 561, 565 (Ill. App. 1991) (noting that immunity does not extend to "(1) [a] public employee's acts based on corrupt or malicious motives or (2) [a] public employee's willful and wanton acts"). The TIA defines "[w]illful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210. As a general rule, "[w]hether conduct is willful and wanton is a factual question." *Carter v. Simpson*, 328 F.3d 948, 951 (7th Cir. 2003); *see also Chelios v. Heavener*, 520 F.3d 678, 693 (7th Cir. 2008) (same).

The gravamen of Grimes's common law claims is that Judkins acted "maliciously and with reckless disregard of [Grimes's] safety and rights," Doc. 13 at p. 10, ¶ 11, and "intended that his conduct in disclosing [Grimes's] transgender status to [Grimes's] co-workers would inflict severe emotional distress on [him] or knew that there was a high probability that his …

14

conduct would cause [him] severe emotional distress," *id*. at p. 15, ¶ 15. At this stage of the case, the court must credit those allegations, which plainly implicate the TIA's willful and wanton conduct exception. *See Payne ex rel. Hicks v. Churchich*, 161 F.3d 1030, 1045-46 (7th Cir. 1998) (holding that allegations "that the Sheriff knew that conditions in the city jail created a substantial risk of self-harm to [the plaintiff] and that the Sheriff nevertheless ordered his Deputy to place the prisoner there" fell within the TIA's willful and wanton exception); *Doe v. Calumet City*, 641 N.E.2d 498, 506 (Ill. 1994) (holding that a police officer who committed IIED was not immune under the TIA). Moreover, the complaint alleges for purposes of his state law claims that Judkins was "not motivated or actuated by a purpose to serve" his employer, Doc. 13 at p 10, ¶ 12; *id*. at p. 15, ¶ 12, which provides a separate ground for holding at the pleading stage that the TIA does not protect Judkins from liability. *See Hedges v. Cnty. of Cook*, 1997 WL 269632, at *4 (N.D. Ill. May 13, 1997) ("In order for an employee to be covered by the [TIA], [that] employee must be acting within the scope of his or her employment at the time of injury.").

        **B.**       **State Law Claims Against Cook County**

The complaint alleges that Cook County, as Grimes's employer, violated the IHRA by subjecting him to a hostile work environment based on his transgender status, segregating him from working in Division Six based on his transgender status, discriminating against him based on his transgender status when it refused to place him on paid leave, and retaliating against him for opposing that paid leave discrimination. Doc. 13 at pp. 17-41. "Illinois courts apply the federal Title VII framework to claims of discrimination made under the [IHRA], and the parties agree that it is appropriate to apply the Title VII framework here." *Reed v. Freedom Mortgage Corp.*, 869 F.3d 543, 547 (7th Cir. 2017); *see* Doc. 18 at 11-12; Doc. 21 at 13-14.

        **1.**       **Hostile Work Environment Claim**

"To state a Title VII hostile work environment claim, [Grimes] must allege (1) [he] was subject to unwelcome harassment; (2) the harassment was based on [his membership in a protected class]; (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is basis for employer liability." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*, 804 F.3d 826, 833-34 (7th Cir. 2015); *see also Dear v. Shinseki*, 578 F.3d 605, 611 (7th Cir. 2009) (same). The third element "is in the disjunctive—the conduct must be *either* severe *or* pervasive." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). This means that "one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013) (internal quotation marks omitted). A court addressing this element must "look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001) (internal quotation marks omitted); *see also Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011) (same). In so doing, the court must bear in mind that the IHRA does not impose a "general civility code" in the workplace and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted); *see also McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004) (similar).

In moving to dismiss Grimes's hostile work environment claim, Defendants argue only that the complaint does not allege harassing conduct that was severe or pervasive. Doc. 18 at 11-

16

12. That argument fails at the pleading stage. The complaint alleges that, based upon Grimes's transgender status, his "[c]o-workers … shunn[ed] [him] and would not communicate with him … on a daily basis" over a several month period, with three examples being: (1) a co-worker telling him, while laughing, "'You really do have a big ass, don't you?'"; (2) another co-worker referring to him as "'girl'"; and (3) a third co-worker, in "referring to an unidentified individual who appeared to be female," remarking to Grimes, "'You see that. That's a man. People ought to tell who they really are. That's how people get killed.'" Doc. 13 at p. 19, ¶ 11. Given the complaint's allegation that harassing conduct of that nature occurred daily over the course of several months, Grimes has pleaded pervasive conduct sufficient to state a hostile work environment claim. *See EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 626 (7th Cir. 2018) (observing that "[a]ctionable discrimination can [consist of] demeaning, ostracizing, or even terrorizing the victim," and noting that the court "must decide whether a reasonable juror could find [the employer's] conduct objectively intimidating or frightening"); *Passananti v. Cook Cnty.*, 689 F.3d 655, 663 (7th Cir. 2012) (holding that a supervisor created a hostile work environment by "'demeaning, degrading and demoralizing'" the plaintiff); *Vill. of Bellwood Bd. of Fire & Police Comm'rs v. Human Rights Comm'n*, 541 N.E.2d 1248, 1256 (Ill. App. 1989) ("[The court] [determines] that there is adequate support for the ALJ's [finding of a hostile work environment]. [The plaintiff] was subjected to a continuous stream of racially derogatory comment, in one form or another, from the officers at the Bellwood police department. The supervising officers were aware of the problem, but took no action to correct it, and, in fact, on some occasions contributed to it. We believe this is exactly the type of racial harassment which the HRA seeks to prevent.").

### 2. Segregation, Discrimination, and Retaliation Claims

Defendants seek dismissal of Grimes's IHRA segregation, discrimination, and retaliation claims on the ground that he does not allege that he suffered an adverse employment action. Doc. 18 at 12-13. Those arguments fail.

Even assuming that a plaintiff pursuing an IHRA segregation claim must plead and prove that he suffered an adverse employment action, *cf. EEOC v. AutoZone, Inc.*, 860 F.3d 564, 569 (7th Cir. 2017) ("[W]e reject [the defendant's] argument … that the lack of an 'adverse employment action' defeats a [segregation claim]."), Grimes clears this hurdle. The complaint alleges that Judkins did not assign Grimes to Division 6 of the Jail because he is transgender, Doc. 13 at p. 25, ¶ 8; that this "constitute[d] segregation of [Grimes] by his employer on the basis of his gender-related identity," *id.* at ¶ 9; that "[w]orking in Division 6 is a desirable assignment because [it] is a minimum security section of the jail with a smaller population," *id.* at ¶ 10; and that the segregation "tended to deprive [him] of a job opportunity [that] could [have] be[en] positive on [his] resume," *id.* at ¶ 11. That suffices to plead an adverse employment action. *See Farrell v. Butler Univ.*, 421 F.3d 609, 614 (7th Cir. 2005) ("[A]dverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well.") (internal quotation marks omitted); *Collins v. State of Ill.*, 830 F.2d 692, 703 (7th Cir. 1987) (same, and specifying that "other forms of adversity" can include "an employer's moving an employee's office to an undesirable location, transferring an employee to an isolated corner of the workplace, and requiring an employee to relocate her personal files while forbidding her to use the firm's stationary and support services") (footnotes omitted).

The complaint also pleads an adverse employment action for purposes of Grimes's discrimination and retaliation claims. Governing precedent holds that a "materially adverse

18

employment action[]" occurs in "cases in which the employee's compensation, benefits or other financial terms of employment are diminished." *Tart v. Ill. Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004). Here, the complaint alleges that "cis-gender employees similarly situated to" Grimes who "had legitimate and reasonable fears for their physical safety at work" were "given paid leaves of absence until the physical safety issues had been resolved," Doc. 13 at p. 32, ¶ 19; *id*. at p. 39, ¶ 19, but that he was denied a paid leave of absence "because of [his] gender-related identity," *id*. at p. 32, ¶ 20, and "in retaliation for … opposing … discrimination against himself based on his gender-related identity," *id*. at p. 39, ¶ 20. That amounts to a diminishment of Grimes's "compensation, benefits or other financial terms of employment" sufficient to support his discrimination and retaliation claims. *Tart*, 366 F.3d at 475; *see also Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012) ("Being forced to take an unpaid leave of absence certainly falls into the first category of material adverse employment actions."); *Hunt v. City of Markham*, 219 F.3d 649, 653 (7th Cir. 2000) (holding that the plaintiffs adduced evidence of an adverse action where "[t]he evidence … created a triable issue of whether, but for [their] race, they would have received raises or perks, or both").

## Conclusion

Defendants' motion to dismiss is denied. They have until May 14, 2020 to answer the operative complaint.

April 23, 2020

_____
United States District Judge

19