IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LOGAN M. GRIMES,<br><br>Plaintiff,<br><br>-vs-<br><br>COUNTY OF COOK, an Illinois county, d/b/a COOK COUNTY HEALTH & HOSPITALS SYSTEM and/or CERMAK HEALTH SERVICES; and MELVIN JUDKINS, in his individual capacity;<br><br>Defendants. | ) | No. 1:19-cv-06091<br><br>Judge Gary S. Feinerman<br><br>Magistrate Judge Jeffrey T. Gilbert |

PLAINTIFF LOGAN GRIMES' MEMORANDUM IN OPPOSITION TO
DEFENDANT MELVIN JUDKINS' MOTION FOR SUMMARY JUDGMENT

NOW COMES the Plaintiff, Logan Grimes ("Grimes"), by and through his attorney, Joanie Rae Wimmer, and submits this memorandum of law in opposition to Defendant Melvin Judkins' motion for summary judgment.

**Introduction.** In this memorandum, statements of fact will be supported by references to the paragraphs of the parties' Local Rule 56.1 statements of fact and responses. Facts from the paragraphs of the Defendant Judkins' Rule 56.1 statement will be cited as "Judkins Stat. ¶"; facts from the Plaintiff's responses to the paragraphs of Defendant Judkins' Rule 56.1 statement will be cited as "Grimes Resp. ¶"; and facts from the paragraphs of the Plaintiff's statement of additional facts will be cited as "Grimes Add. ¶".

**Rules of decision applicable to a motion for summary judgment.** Fed.R.Civ.P. 56(a) provides that a summary judgment should be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Conversely, summary judgment is inappropriate when there are genuine issues of material fact to be decided by the jury. (See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).) A dispute of fact is material if it might affect the outcome of the claim. (*Id., at* 248.) The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for the motion (*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)), and therefore, the party opposing the motion need present evidence only to rebut the grounds advanced by the moving party in the motion for summary judgment. Before a movant can shift the burden in summary judgment to a non-moving party, the movant must meet its own burden of production. As the Seventh Circuit explained:

> "The *Celotex* Court decided only that where the movant demonstrates that the nonmovant will be unable to produce any evidence at trial supporting an essential element of a claim for which the nonmovant bears the burden of proof, summary judgment is appropriate even though the movant cannot adduce any affirmative evidence *disproving* the essential claim. *Id.* But even after *Celotex*, an unsupported—or 'naked'—motion for summary judgment does not require the nonmovant to come forward with evidence to support each and every element of its claims. [Citation omitted] Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial." (Emphasis in original.)
>
> *Logan v. Commercial Union Insurance Co.*, 96 F.3d 971, 979 (7th Cir. 1996).

In evaluating a motion for summary judgment, the court must view the evidence in the light reasonably most favorable to the nonmoving party (*Stark v. Johnson & Johnson*, 2021 WL 3732273 (7th Cir. 2021) (page 3)), and must draw all reasonable inferences in the light most favorable to the nonmovant. (*Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 400 (7th Cir. 1992).) The reason for this rule is that credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.

(*Anderson v. Liberty Lobby*, *supra*, at 255.) Testimony from the plaintiff, himself, so long as it is material, based on personal knowledge, and consists of facts admissible in evidence, is sufficient to create an issue of fact to be tried. See *Payne v. Pauley*, 337 F.3d 767, 770-773 (7th Cir. 2003).

**Statement of Facts.** The Plaintiff was born in 1962 with a vagina, not a penis; he developed breasts in his teenage years, and, for the first 37 years of his life, lived as a female. (Grimes Add. ¶ 1) In 2000 Grimes was diagnosed with gender identity disorder, which is now referred to as gender dysphoria, and in 2003, he commenced hormone therapy, testosterone, to treat his gender dysphoria, and Grimes is still taking testosterone today. (Grimes Add. ¶ 2) Grimes also had chest reconstructive surgery in 2004 and what they call bottom surgery or gender confirmation surgery in 2006 to treat his gender dysphoria. (Grimes Add. ¶ 3) As a result of the hormone therapy, chest reconstructive surgery and gender confirmation surgery, by the year 2008 and since then Grimes has appeared unambiguously male, with a male build, male pattern baldness, and facial hair. (Grimes Add. ¶ 4) In 2003 Grimes changed his name from his birth name to Logan Grimes, and by 2004 he had had the sex marker on his driver's license changed from F to M and had the record of his sex changed to male with the Social Security Administration. (Grimes Add. ¶ 5)

When Grimes transitioned, he worked at Howard Brown Health Center and, because he transitioned on the job, he had no choice but had to be open about being transgender. (Grimes Add. ¶ 6) Commencing in 2008, Grimes kept his transgender status private, and from then until after September 28, 2018, Grimes did not disclose his transgender status to anyone but family members. (Grimes Add. ¶ 7) Although Grimes testified that he had publicly told the story of his transition to different publications, and that he spoke with the Windy City Times or a similar publication about his transition, one of the disclosures was after the grievance thing with the

county relating to Judkins and the other occasion was prior to 2008. (Grimes Add. ¶ 8)

In September of 2018, Judkins supervised the correctional medical technicians who delivered prescribed medications to the detainees in the jail, not more than 14 people referred to as the med team, including Grimes. (Grimes Add. ¶ 9) Katie Healy was a correctional medical technician who worked on the med team and was supervised by Judkins. (Grimes Add. ¶ 10) On September 28, 2018, Healy, Judkins, paramedic Bain, and paramedic Centeno were in the back office of the med team, talking about a new guy who was supposed to start as well as a paramedic named Gierke, and Judkins asked if the others thought Gierke was gay. (Grimes Add. ¶ 11) After discussing whether Gierke was gay, Judkins said, "You know, like Logan," and Judkins said, "Yeah, come on—you know—Logan. I worked with him for a long time and he's—you know—he's transgender." (Grimes Add. ¶ 12) At that point in time, protective custody for transgender detainees was predominantly in Division 6 of the jail. (Grimes Add. ¶ 13) Katie Healy had heard that Grimes was transgender before September 28, 2018, from another paramedic who used to work on the med team named Beth Connors. (Grimes Add. ¶ 14) Bain, a correctional medical technician on the med team who was also supervised by Judkins, testified that during the conversation on September 28, 2018, Judkins said that Grimes is transgender, and that, prior to that time, she (Bain) had not heard from anyone that Grimes is transgender. (Grimes Add. ¶ 15) Arturo Centeno, who began working on the med team under Judkins' supervision in September of 2018, testified at his deposition that the conversation on September 28, 2018, was a matter that he once knew about but could no longer recall well enough to testify about fully and accurately. (Grimes Add. ¶ 16) Centeno testified, however, that Centeno Deposition Exhibit No. 1 was an email Centeno sent to Mr. Tillar on October 16, 2018. (Grimes Add. ¶ 17) Centeno testified that he wrote the email when the matter was fresh in his

memory, and that the email accurately reflects his knowledge at the time, and that John Tillar (the union representative) "just told us to write what had happened in the room at the time, whatever we remembered and to write an email and send it to him so there would be a paper trail." (Grimes Add. ¶ 18) Centeno's email to John Tillar stated as follows:

> "On September 28 2018, I was sitting in one of the med-tech rooms with Paramedic Bain and Paramedic Healy inputting meds that we had delivered throughout the day when Supervisor Melvin walked into the room and started talking to us. . . . [T]hen the conversation switched over to a current employer who was Paramedic Gireke who i don't know only in passing about his sexuality stating that if he was gay. I answered i wasn't sured but people assume that he is and Paramedic Bain stated he was a ricky rescue. Mel stated he reminded him of a mountain man which I'm unsure of what that means, then Supervisor Mel switched over to a coworker of our Paramedic Logan stating that he had and issue in division six ' Ive known logan for many years and he has never told but' thats when Healy had given Mel a strong look but he began to proceed 'I'm sure they know and he looked at me but i sat there with no response because I've only known logan for a month since I'm new to the department, then he drew his attention to Paramedic Bain stating, ' Well I'm sure Bain knows, rite bain you know' Healy then responded to mel ' i don't think they know mel. He then asked the same question and healy responded to the response again. Mel then stated ' Logan is a transgender thats why he cant go to division six' . . ."
>
> (Grimes Add. ¶ 19)

Centeno testified that he had no reason to believe, prior to the conversation on September 28, 2018, that Grimes is transgender. (Grimes Add. ¶ 20)

Grimes never told Judkins that he (Grimes) is transgender and never gave Judkins permission to disclose his (Grimes') transgender status to anyone else. (Grimes Add. ¶ 21)

Ashley Austin, Ph.D., an expert witness retained by the Plaintiff, testified that the statements she wrote in her report in this case are all true to the best of her knowledge and belief. (Grimes Add. ¶ 22) The issue of whether Dr. Austin's opinions are admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) is the subject of a separate motion, the Defendants' motion to exclude Dr. Austin's testimony. (Doc. 112) Dr. Austin is, among other

things, a licensed clinical social worker (LCSW) with a private practice named Affirmative Change, which is focused on transgender individuals, where she serves as a therapist providing mental health services. (Grimes Add. ¶¶ 23, 24) Dr. Austin testified that a great part of her practice involves the initial assessment of gender dysphoria and ongoing assessment to provide letters to clients who are seeking medical interventions for their gender dysphoria. (Grimes Add. ¶ 25) Dr. Austin testified at her deposition as follows in response to a question about the part of her practice that involves writing letters to medical doctors about a client's gender dysphoria:

> "In many instances, doctors will only provide gender affirming interventions if they -- Well, certainly surgeries, if they receive one, usually, at least one letter from a professional like myself. Sometimes they need two letters from two different people, so I have written a number of those. In some instances it's even required now for -- for hormone replacement therapy for testosterone or for estrogen for trans women. So I have written a number of these letters to different medical professionals, who are both endocrinologists and/or surgeons and other doctors."
>
> (Grimes Add. ¶ 26)

Gender dysphoria is defined in the American Psychiatric Association's most recent addition (2013) of the Diagnostic and Statistical Manual of Mental Disorders 5 (DSM 5) as follows:

> "A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration, as manifested by at least two or more of the following: [List of symptoms omitted]
>
> The condition is associated with *clinically significant distress* or impairment in social, occupational, or other important areas of functioning." (Emphasis in original.)
>
> (Grimes Add. ¶ 28)

Dr. Austin stated that it was her expert opinion to a reasonable degree of certainty in her field that "the disclosure of Mr. Logan Grimes' transgender status by his supervisor, Melvin Judkins, to Mr. Grimes' co-workers is tantamount to the disclosure by Mr. Judkins of Mr.

Grimes' confidential medical information." (Grimes Add. ¶ 29) Dr. Austin explained:

> "In sum, Mr. Grimes is a transgender man who was able to pass and be stealth at work as a result of his past (surgical interventions) and ongoing (weekly doses of testosterone) medical gender affirming interventions that address his medical condition (gender dysphoria). As such, it is clear that the disclosure of Mr. Grimes' transgender identity by his supervisor Mr. Judkins was tantamount to a disclosure of Mr. Grimes' private and confidential medical information, namely his issues with gender dysphoria, the corresponding gender dysphoria diagnosis, and the confidential medical interventions he has accessed and/or continues to access in order to alleviate his gender dysphoria and affirm his masculine gender identity. Given that Mr. Grimes is very obviously male presenting, when co-workers were told of Mr. Grimes' transgender identity, the fact that Mr. Grimes had transitioned through a range of gender affirming medical interventions would become known."
>
> (Grimes Add. ¶ 30)

Judkins, himself, testified that he believed that the assertion that Grimes is transgender meant that he had a sex change, and that, if a person gets a sex change, that's a medical procedure. (Grimes Add. ¶ 32) Judkins also testified that he believed that someone's transgender status would be private information which should not be disclosed to others without the permission of the person involved. (Grimes Add. ¶ 33)

Judkins testified that the Cook County jail is not a safe place for transgender people if they are not in the protective tier. (Grimes Add. ¶ 34) When Grimes worked passing out medicines to the detainees, a lot of the time he was by himself, and when Grimes was on the tier in the max unit, there might be about 45 detainees there in the open area. (Grimes Add. ¶ 35)

Grimes testified that, after the incident, he could not return to work because he felt unsafe. (Grimes Add. ¶ 37) At his deposition, Grimes was asked what symptoms of emotional distress he had suffered, and he replied:

> "Sleepless nights. My blood pressure has gone up, you know, nervous about the future and providing for my family. Also house, not able to make my payments, so my house is going into foreclosure. Those are the kind of things that emotionally weigh on a person, safety, next step."

(Grimes Add. ¶ 38)

Grimes testified that it hurts a lot when he is treated differently than other people because of an aspect of who he is that he has no control over. (Grimes Add. ¶ 39) Judkins used to make jokes about the transgender detainees. (Grimes Add. ¶ 40) There is evidence that Judkins lied when he testified that he does not recall specifically how he received information regarding Grimes' transgender status. (Grimes Resp. ¶ 20)

**Argument.**

**I. There is evidence from which the jury could conclude that Judkins violated Grimes' constitutional right to substantive due process of law by disclosing intimate personal medical information about Grimes to his coworkers without there being any governmental interest in the disclosure, and since the unlawfulness of Judkins' conduct was apparent in light of existing law, Judkins is not entitled to qualified immunity.**

As this Court noted in its Memorandum Opinion and Order (Doc. 43), p. 4, denying the Defendants' motion to dismiss in this case:

> "A substantive due process claim 'is limited to violations of fundamental rights.' *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010). The Seventh Circuit has held that one fundamental right is the 'right to the privacy of medical, sexual, financial, and perhaps other categories of highly personal information—information that most people are reluctant to disclose to strangers.' *Wolfe v. Schaefer*, 619 F.3d 782, 785 (7th Cir. 2010). This 'right is defeasible only upon proof of a strong public interest in access to or dissemination of the information.' *Ibid.*; see also *Denius v. Dunlap*, 209 F.3d 944, 956 (7th Cir. 2000) ('[T]his Circuit has outlined a clearly established "substantial" right in the confidentiality of medical information that can only be overcome by a sufficiently strong state interest.')."

Based on the evidence outlined above, it is clear that the jury could conclude that Judkins disclosed to at least two of Grimes' coworkers, who were otherwise unaware, that Grimes had the serious medical condition known as gender dysphoria and had had medical interventions to allow him to present unambiguously male, or, as Judkins himself described it in lay terms, "a sex change." (Grimes Add. ¶ 32) And Judkins has not suggested that there was any state interest in

disclosing this information to Grimes' coworkers. This conduct violated Grimes' substantive due process rights under *Denius* and the other authorities cited by this Court in its Memorandum Opinion and Order. See also *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999), a case where the Court recognized that "the Constitution does indeed protect the right to maintain the confidentiality of one's transsexualism," and stated that "transsexualism is the unusual condition that is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." See also *Love v. Johnson*, 146 F.Supp.3d 848, 856 (E.D.Mich. 2015) (Michigan Secretary of State policy requiring, in order to change one's gender on one's state ID, a birth certificate showing the sex to which the individual wishes to change his or her state ID, implicates the "fundamental right of privacy" under the Due Process Clause).

Judkins cites the case of *Best v. Berard*, 837 F.Supp.2d 933 (N.D.Ill. 2011), a case where Judge Kennelly held that disclosure of the Plaintiff's height and weight was not a due process violation. Judkins claims that *Best* interpreted *Denius* to apply to disclosure of medical records, only, not medical information generally, and Judkins argues that because he did not release medical records, and because the Plaintiff cannot prove that Judkins became aware of Grimes' transgender status by access to Grimes' medical records, Judkins should be granted summary judgment. Judkins' interpretation of *Best* is inaccurate. In *Best*, Judge Kennelly cited *Anderson v. Romero*, 72 F.3d 518, 522 (7th Cir. 1995), a case where a prison superintendent and a guard disclosed the detainee's HIV+ status, telling another detainee that "Anderson was a homosexual and a faggot and that [another detainee] could catch AIDS from him." (72 F.3d 518, 520.) The *Anderson* case did not involve disclosure of medical records. Yet Kennelly cited *Anderson* as a case where the Seventh Circuit cited the "right to conceal one's medical history" (837 F.Supp.2d 933, 938), and Kennelly wrote:

> "[T]he categories of information that the Seventh Circuit has deemed protected by the constitutional privacy right have been far more personal, such that their disclosure would lead to greater potential for embarrassment or abuse. *See*, *e.g.*, *Anderson*, 72 F.3d at 523 (HIV status); *Shaill v. Tippecanoe County Sch. Corp.*, 864 F.2d 1309, 1322 n. 19 (7th Cir. 1988) (use of prescription drugs)."
>
> 837 F.Supp.2d 933, 938.

There is nothing in any case law which suggests that it is constitutional to disclose an individual's intimate personal medical information as long as the person doing the disclosing did not personally look at the individual's medical records, and did not disclose the actual records themselves. Nor should there be. Even where the discloser's source of information is hearsay, the disclosure of intimate personal medical information is as culpable and has the same effect as it would if the discloser's source of information was a direct review of medical records.

Judkins also states, without really presenting an argument, that the fact that some other coworkers had heard about Grimes' transgender status prior to September 28, 2018, means that Judkins did not violate Grimes' due process rights. But Bain and Centeno were unaware that Grimes was transgender, and Judkins effectively disclosed Grimes' medical history to them. See also *Ray v. McCloud*, 507 F.Supp.3d 925, 934 (S.D. Ohio 2020) (forced disclosure of transgender status a violation of substantive due process even where individual's transgender status was known by certain others).

Finally, Judkins is not entitled to qualified immunity. As pointed out in *Green v. Butler*, 420 F.3d 689, 701 (7th Cir. 2005), quoting from *Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996), " 'The question [on qualified immunity] is whether a reasonable state actor would have known that his actions . . . were unlawful.' " And as stated in *Green*, quoting from *Hope v. Pelzer*, 536 U.S. 730, 741 (2002):

> " 'Although earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they

are not necessary to such a finding.' "

(420 F.3d 689, 701.)

Officials can still be on notice that their conduct violates established law even in novel factual circumstances, and the salient question is not whether there is a prior case on all fours, but whether the state of the law at the relevant time gave the defendant fair warning that his treatment of the plaintiff was unconstitutional. (*Green*, 420 F.3d at 701.) As the Court stated in *Denius*, to defeat a defense of qualified immunity, all that is required is that the " 'contours of the right . . . have been established so that the unlawfulness of the defendant's conduct would have been apparent in light of existing law.' " 209 F.3d 944, 950.

In *Denius*, decided 18 years before the incident in this case, the Seventh Circuit, in rejecting a claim of qualified immunity in that case, stated as follows:

> "As discussed above, this Circuit has outlined a clearly established 'substantial' right in the confidentiality of medical information that can only be overcome by a sufficiently strong state interest. See *Anderson*, 72 F.3d at 522."
>
> (209 F.3d at 956.)

*Denius* and *Anderson*, both Seventh Circuit cases decided long before 2018, made it apparent that Judkins' conduct was unlawful. Judkins, himself, testified that he believed that the assertion that Grimes is transgender meant that Grimes had a sex change, and that, if a person gets a sex change, that's a medical procedure (Grimes Add. ¶ 32), and Judkins, himself, testified that he believed that someone's transgender status would be private information which should not be disclosed to others without the permission of the person involved. (Grimes Add. ¶ 33) Judkins is not entitled to qualified immunity.

## II. There is evidence from which the jury could find all the elements of the tort of invasion of privacy—public disclosure of private fact under Illinois law.

Judkins argues that Grimes cannot establish that his transgender status was a private fact.

Judkins bases his argument on the fact that, prior to September 28, 2018, Healy had already heard that Grimes is transgender from a former member of the med team (Grimes Add. ¶ 14) which was supervised by Judkins (Grimes Add. ¶ 9), and on the fact over ten years earlier, while Grimes was in the process of transitioning, before Grimes began living in stealth, Grimes told his transition story to a publication. (Grimes Add. ¶ 8). Judkins has presented no evidence that the publication actually published a story about Grimes transition. But the fact that Healy knew and that, over ten years earlier, before Grimes began living in stealth, Grimes told his story to a publication, does not mean that his transgender status was not a private fact. In *Johnson v. K Mart Corp.*, 311 Ill. App. 3d 573, 579, 723 N.E.2d 1192 (1st Dist. 2000), the Court held that "highly personal information" involving "family matters, health problems, and sex lives," which was discussed by employees of K Mart among each other and overheard by private investigators, was "private" information, for purposes of this tort, improperly disclosed to K Mart. The fact that the employees shared this information with a few others did not take away the private nature of the facts. So under Illinois law, the test for whether a fact is private is whether it involves highly personal information, involving health problems, which the individual wishes to keep private, like Grimes' transgender status. See also *Diaz v. Oakland Tribune, Inc.*, 188 Cal.Rptr. 762, 771-773 (Cal. App. 1983) (transgender status was a private fact where the individual had changed her name and was living in stealth even though a confidential source was able to show reporter that the individual was transgender). The facts that, prior to September 28, 2018, Healy had heard that Grimes was transgender from a former member of the med team, and that Grimes told a publication about his transition years earlier do not make his transgender status a public fact under Illinois law.

Judkins also argues that Grimes cannot establish that the disclosure would be highly

offensive to a reasonable person, again relying on the fact that over ten years earlier, while Grimes was in the process of transitioning, before Grimes began living in stealth, Grimes told his transition story to a publication. (Grimes Add. ¶ 8) This argument is without merit. Grimes changed his name in 2003 and by 2004 had changed his sex on his driver's license and with Social Security. (Grimes Add. ¶ 5) Grimes had been living in stealth commencing in 2008, not disclosing his transgender status thereafter to anyone but family members. (Grimes Add. ¶ 7) Under these circumstances, a reasonable person would find it highly offensive for his supervisor at work to disclose his transgender status. See *Doe v. Templeton*, 2004 WL 1882436 (N.D.Ill. 2004) (page 3) where the Court stated "this court agrees with plaintiff that her sexual orientation is not a legitimate public concern and disclosure could be highly offensive."

Finally Judkins argues that Grimes will not be able to prove "publicity." His argument fails, however, under Illinois law under the "special relationship" rule. Under that rule, "the public disclosure requirement may be satisfied by proof that the plaintiff has a special relationship with the 'public' to whom the information is disclosed," like the med team here. (*Miller v. Motorola, Inc.*, 202 Ill. App. 3d 976, 981, 560 N.E.2d 900 (1st Dist. 1990).) In *Miller*, the Court upheld the complaint which alleged that the plaintiff's employer had told at least one of the plaintiff's co-employees about the plaintiff's mastectomy because of the plaintiff's "special relationship" with her coworkers. See also *Johnson v. K Mart Corp.*, 311 Ill. App. 3d 573, 580, 723 N.E.2d 1192 (1st Dist. 2000) (disclosure to the plaintiffs' single employer enough).

## III. Judkins' arguments directed to the tort of intentional infliction of emotional distress are without merit.

Judkins argues that Grimes will be unable to prove that Judkins' conduct in disclosing Grimes' transgender status to his coworkers was extreme and outrageous. There is evidence that

Judkins disclosed Grimes' transgender status to at least two of Grimes' coworkers on the med team who were otherwise unaware of it. (Grimes Add. ¶ 15, 20) Judkins did this despite the fact that Grimes appeared unambiguously male, with a male build, male pattern baldness, and facial hair. (Grimes Add. ¶ 4), had changed his name and sex on his driver's license (Grimes Add. ¶ 5), and had been living in stealth for ten years. (Grimes Add. ¶ 7) That is extreme and outrageous, but here there is more. Judkins, Grimes' supervisor, also testified that the Cook County jail is not a safe place for transgender people if they are not in the protective tier. (Grimes Add. ¶ 34) And when Grimes worked passing out medicines to the detainees, a lot of the time he was by himself, and when Grimes was on the tier in the max unit, there might be about 45 detainees there in the open area. (Grimes Add. ¶ 35) People talk at work. People gossip. When Judkins informed two of Grimes' coworkers of Grimes' transgender status, Judkins made it more likely that word would get out to the detainees that Grimes was transgender which put Grimes' physical safety at work at unnecessary risk.

Judkins also argues that Grimes will be unable to show that Judkins knew or should have known that the disclosure would cause Grimes severe emotional distress. The only thing Judkins cites in support of that argument is evidence that Judkins and Grimes got along at some point in the past, perhaps before Judkins found out that Grimes was transgender. Those facts do not negate this element of the tort and do not shift the burden to the plaintiff to present evidence. Moreover, the test is satisfied if Judkins actually knew *or should have known* that outing Grimes to his coworkers would cause Grimes severe emotional distress. Any supervisor should know that outing an employee as transgender to his coworkers is likely to cause severe emotional distress. That is all the more obvious in this case where Judkins testified that the place of employment where the employee worked was unsafe for transgender people. (Grimes Add. ¶ 34)

Finally, there is evidence that Judkins held transgender people in low regard as he used to make jokes about them. (Grimes Add. ¶ 40) Judkins does not challenge Grimes' ability to prove that he did, in fact, suffer severe emotional distress.

**IV. Based on the evidence in this case the jury could conclude that, in outing Grimes as transgender to his co-workers, Judkins was not acting in the scope of his employment, and, therefore, that Judkins is not immune under the Illinois Tort Immunity Act.**

Under *Adames v. Sheahan*, 233 Ill. 2d 276, 299, 909 N.E.2d 742 (2009), conduct of a servant is within the scope of employment if, but only if, (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits, and (3) "it is actuated, at least in part, by a purpose to serve" the employer. All three factors must be present. (*Id.* at 299.) Because Judkins did not present any argument as to the first or third factor, Judkins did not shift the burden to the Plaintiff to present any evidence on this point. Moreover, this is an issue concerning which the jury could find either way, and pleading in the alternative is allowed. (Fed.R.Civ.P. 8(d)(3).) Judkins never testified that he outed Grimes as transgender, at least in part, to serve Cook County. And in Judkins' memorandum in support of his motion for summary judgment, Judkins refers to the discussion as "alleged gossip." (Judkins' memorandum, p. 10) The jury could find that gossip and discussion of the sexual orientation and gender identity of employees are not the kind of work Judkins is employed to perform, that Judkins' conduct was not actuated, even in part, by a purpose to serve Cook County, and that, therefore, Judkins was not acting within the scope of his employment when he outed Grimes.

Respectfully submitted,

/s/ Joanie Rae Wimmer
Joanie Rae Wimmer

JOANIE RAE WIMMER
Attorney at Law
715 Lake Street, Suite 516
Oak Park, Illinois 60301
(630) 810-0005
jwimmerlaw@sbcglobal.net
Attorney No. 3125600