IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LOGAN M. GRIMES, ) <br> ) <br> Plaintiff, ) <br> ) <br> -vs- ) <br> ) <br> COUNTY OF COOK, an Illinois county, d/b/a ) <br> COOK COUNTY HEALTH & HOSPITALS ) <br> SYSTEM and/or CERMAK HEALTH ) <br> SERVICES; and MELVIN JUDKINS, in his ) <br> individual capacity; ) <br> ) <br> Defendants. ) | No. 1:19-cv-06091 <br><br> Judge Gary S. Feinerman <br><br> Magistrate Judge Jeffrey T. Gilbert |

PLAINTIFF LOGAN GRIMES' MEMORANDUM IN OPPOSITION TO
DEFENDANT COOK COUNTY'S MOTION FOR SUMMARY JUDGMENT

NOW COMES the Plaintiff, Logan M. Grimes ("Grimes"), by and through his attorney, Joanie Rae Wimmer, and submits this memorandum of law in opposition to the motion for summary judgment filed on behalf of Defendant County of Cook (the "County").

**Introduction.** In this memorandum, statements of fact will be supported by references to the paragraphs of the parties' LR 56.1 statements of fact and responses. Facts from the paragraphs of Defendant County's LR 56.1(a)(2) statement will be cited as "County Stat. ¶"; facts from the Plaintiff's responses to the paragraphs of Defendant County's LR 56.1(a)(2) statement will be cited as "Grimes Resp. ¶"; and facts from the paragraphs of the Plaintiff's statement of additional facts under LR 56.1(b)(3) will be cited as "Grimes Add. ¶". The Plaintiff notes that the County's memorandum is in excess of this Court's page limitations.

**Rules of decision applicable to a motion for summary judgment.** Fed.R.Civ.P. 56(a) provides that a summary judgment should be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Conversely, summary judgment is inappropriate when there are genuine issues of material fact to be decided by the jury. (See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).) A dispute of fact is material if it might affect the outcome of the claim. (*Id., at* 248.) The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for the motion (*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)), and therefore, the party opposing the motion need present evidence only to rebut the grounds advanced by the moving party in the motion for summary judgment.

In evaluating a motion for summary judgment, the court must view the evidence in the light reasonably most favorable to the nonmoving party (*Stark v. Johnson & Johnson*, 10 F.4th 823, 825 (7th Cir. 2021)), and must draw all reasonable inferences in the light most favorable to the nonmovant. (*Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 400 (7th Cir. 1992).) The reason for this rule is that credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. (*Anderson v. Liberty Lobby*, *supra*, at 255.) Testimony from the plaintiff, himself, so long as it is material, based on personal knowledge, and consists of facts admissible in evidence, is sufficient to create an issue of fact to be tried. See *Payne v. Pauley*, 337 F.3d 767, 770-773 (7th Cir. 2003).

**Statement of Facts.** Grimes was born in 1962 with a vagina, not a penis; he developed breasts in his teenage years, and, for the first 37 years of his life, lived as a female. (Grimes Add. ¶ 1) In 2000 Grimes was diagnosed with gender identity disorder, which is now referred to as gender dysphoria, and in 2003, he commenced hormone therapy, testosterone, to treat his gender dysphoria, and Grimes is still taking testosterone today. (Grimes Add. ¶ 2) Grimes also had chest reconstructive surgery in 2004 and what they call bottom surgery or gender confirmation surgery

in 2006 to treat his gender dysphoria. (Grimes Add. ¶ 3) As a result of those medical interventions, by the year 2008 and since then Grimes has appeared unambiguously male, with a male build, male pattern baldness, and a beard or mustache. (Grimes Add. ¶ 4) In 2003 Grimes changed his name from his birth name to Logan M. Grimes, and by 2004 he had had the sex marker changed from F to M on his driver's license and had had the record of his sex with the Social Security Administration changed from female to male. (Grimes Add. ¶ 5) Commencing in 2008, Grimes kept his transgender status private, and from then until after September 28, 2018, Grimes did not disclose his transgender status to anyone but family members. (Grimes Add. ¶ 6)

In February 2013 Grimes began working for Defendant County as a correctional medical technician II. (County Stat. ¶ 2) Judkins supervised the correctional medical technicians who delivered prescribed medications to the detainees in the jail, not more than 14 people referred to as the med team, including Grimes. (Grimes Add. ¶ 7)

Commencing in the spring of 2018, and continuing until Grimes stopped reporting to work after September 28, 2018, certain coworkers of Grimes, who prior to the spring of 2018 used to converse with him, began ignoring Grimes when he spoke to them at work; those coworkers included Donna Brown, Dora Tapia and Gerald Logue, coworkers on the med team, as well as nurses who worked in the urgent care area of Cermak. (Grimes Add. ¶ 8) In the late spring or early summer of 2018, Moishi Brittman, a coworker of Grimes on the med team, called Grimes "girl" on at least three occasions at work. (Grimes Add. ¶ 9) In the late spring or early summer of 2018, Shirley McBride, a paramedic and coworker of Grimes, told him, while laughing, "You really do have a big ass, don't you?" and this incident occurred at work in front of other employees. (Grimes Add. ¶ 10) In August of 2018, as Grimes was walking within the Cook County jail compound, a nurse whose last name is Bradford told Grimes, referring to an

unidentified individual who appeared to be female, "You see that. That's a man. People ought to tell who they really are. That's how people get killed." (Grimes Add. ¶ 11) Grimes believed that this harassment was due to his gender-related identity. (Grimes Add. ¶ 12) These incidents of harassment at work were highly offensive to Grimes; they made him feel extremely uncomfortable when he had to walk around the jail compound, and they interfered, to an extent, with his work because, after the harassment started, Grimes no longer felt safe using the bathroom in the mens locker room and he used the single occupancy bathrooms exclusively even when the bathroom in the mens locker room would have been more convenient. (Grimes Add. ¶ 13)

Katie Healy was a correctional medical technician who worked on the med team and was supervised by Judkins. (Grimes Add. ¶ 14) On September 28, 2018, Healy, Judkins, paramedic Bain, and paramedic Centeno were in the back office of the med team, talking about a new guy who was supposed to start as well as a paramedic named Gierke, and Judkins asked if the others thought Gierke was gay. (Grimes Add. ¶ 15) After discussing whether Gierke was gay, Judkins said, "[O]h, you know—like Logan," and Judkins said, "Yeah, come on—you know—Logan. I worked with him for a long time and he's—you know—he's transgender." (Grimes Add. ¶ 16) At that point in time, protective custody for transgender detainees was predominantly in Division 6 of the jail. (Grimes Add. ¶¶ 17, 22)

Arturo Centeno, who began working on the med team under Judkins' supervision in September of 2018, testified at his deposition that the conversation on September 28, 2018, was a matter that he once knew about but could no longer recall well enough to testify about fully and accurately. (Grimes Add. ¶ 18) Centeno testified, however, that Centeno Deposition Exhibit No. 1 was an email Centeno sent to Mr. Tillar on October 16, 2018. (Grimes Add. ¶ 19) Centeno testified that he wrote the email when the matter was fresh in his memory, and that the email

accurately reflects his knowledge at the time, and that John Tillar (the union representative) "just told us to write what had happened in the room at the time, whatever we remembered and to write an email and send it to him so there would be a paper trail." (Grimes Add. ¶ 20) Centeno's email to John Tillar stated as follows:

> "On September 28 2018, I was sitting in one of the med-tech rooms with Paramedic Bain and Paramedic Healy inputting meds that we had delivered throughout the day when Supervisor Melvin walked into the room and started talking to us. . . . [T]hen the conversation switched over to a current employer who was Paramedic Gireke who i don't know only in passing about his sexuality stating that if he was gay. I answered i wasn't sured but people assume that he is and Paramedic Bain stated he was a ricky rescue. Mel stated he reminded him of a mountain man which I'm unsure of what that means, then Supervisor Mel switched over to a coworker of our Paramedic Logan stating that he had and issue in division six ' Ive known logan for many years and he has never told but' thats when Healy had given Mel a strong look but he began to proceed 'I'm sure they know and he looked at me but i sat there with no response because I've only known logan for a month since I'm new to the department, then he drew his attention to Paramedic Bain stating, ' Well I'm sure Bain knows, rite bain you know' Healy then responded to mel ' i don't think they know mel. He then asked the same question and healy responded to the response again. Mel then stated ' Logan is a transgender thats why he cant go to division six' . . ."

(Grimes Add. ¶ 21)

Bain-Norris testified that in the conversation Judkins said that Grimes cannot go to Division 6 because Grimes was identified as transgender by a detainee there. (Grimes Add. ¶ 22)

On a number of occasions, Judkins teased the men on the med team when they would go to the tier with transgender detainees, by saying "you know you like that, that's your kind of woman," those types of comments. (Grimes Add. ¶ 40)

On or about October 16, 2018, Grimes sent an email to the Director of the Equal Employment Opportunity ("EEO") Office at the Cook County Health & Hospitals System ("CCHHS"), Nicholas Krasucki. (Grimes Add. ¶ 23) In said email, Grimes wrote to Krasucki, among other things, the following:

> "For the past few months, I've felt a shift in my interactions with some my colleagues. People who use to engage me in conversation no longer converse with me. Several colleagues have called me 'girl' but immediately apologized. Co-workers making comments about my body parts as well as people questioning my gender and co-workers engaging me in conversations on how transgender people should always tell people the truth because 'that's how they get hurt'. On Oct 1st, my suspicions were confirmed when several of my colleagues informed me that my direct supervisor Melvin Judkins had disclosed my gender history to them September 28, 2018."

(Grimes Add. ¶ 24)

The Equal Employment Opportunity Discrimination & Harassment Policy of CCHHS prohibits discriminatory harassment and defines discriminatory harassment in part, as follows: "Epithets, slurs, negative stereotyping, offensive, intimidating or hostile acts, which are communicated by any means . . . and which relate to . . . sexual orientation (which includes gender related identity) . . . ." (Grimes Add. ¶ 25) The Policy provides, "The CCHHS Equal Employment Opportunity Division will conduct a prompt investigation of any report of an incident alleging discrimination, sexual harassment or discriminatory harassment. (Grimes Add. ¶ 26)

At Grimes' first meeting with Krasucki about Grimes' October 16, 2018 email to Krasucki, Grimes discussed with Krasucki the ongoing situation with coworkers ignoring him when he spoke with them at work; the fact that his coworker on the med team, Moishi Brittman, had called him "girl" at least three times at work; the incident involving Shirley McBride when, at work, she told Grimes, while laughing, "You really do have a big ass, don't you"; and the incident involving nurse Bradford when she said to Grimes within the Cook County jail compound, referring to an unidentified individual who appeared to be female, "You see that. That's a man. People ought to tell how they really are. That's how people get killed." (Grimes Add. ¶ 27) At that meeting, Grimes provided to Krasucki the names of all of the people involved in those incidents. (Grimes Add. ¶ 28)

Nicholas Krasucki, who had been the EEO Director for CCHHS since 2015, testified that shunning a coworker because of the coworker's gender identity can be a form of discriminatory harassment, as could coworkers making comments about a transgender employee's body parts. (Grimes Add. ¶ 29)  Krasucki testified that he did not conduct an investigation into any other employees other than Melvin Judkins, that he (Krasucki) did not conduct an investigation into Grimes' allegation that coworkers were no longer conversing with him, into Grimes' statements in his email about colleagues calling him "girl," into coworkers making comments about Grimes' body parts, or about nurse Bradford's statement about how transgender people should always tell the truth because that is how they get hurt. (Grimes Add. ¶ 30)  When Krasucki was asked why he did not investigate Grimes' statement in the email that coworkers were making comments about his body parts, Krasucki replied, "I can't." (Grimes Add. ¶ 31)  When Krasucki was asked why he did not investigate Grimes' statements in his email about how people who used to engage him in conversation were no longer conversing with him, Krasucki replied, "I can't answer that question." (Grimes Add. ¶ 32)  When Krasucki was asked why he did not investigate Grimes' statements in his email that several colleagues had called him girl, Krasucki testified, "I can't answer that question." (Grimes Add. ¶ 33)

Immediately prior to the first meeting Grimes had with Krasucki in October of 2018 about Grimes' email to Krasucki, when Grimes was waiting in the hallway in front of the women's bathroom with Shanee Madison, the EEO investigator assigned to Grimes' complaint, Grimes told Madison that he needed to use the restroom and asked her where the restroom was, and Madison appeared shocked and asked Grimes with an incredulous tone of voice, as if she could not believe it, "You want to use the mens bathroom?" Grimes responded, "Yes," and then Madison directed Grimes to the mens bathroom. (Grimes Add. ¶ 34)  At a subsequent meeting

with Timothy Hoppa, a lawyer for CCHHS, relating to Grimes' grievance about Melvin Judkins, Grimes told Hoppa in detail about his encounter with Shanee Madison. (Grimes Add. ¶ 35)

Grimes had a meeting with Feroze Khan in early November of 2018 at which the subject of paid leave came up. (Grimes Add. ¶ 36) At that meeting Khan told Grimes that, when nurses had been placed in an unsafe situation, that that was the discretion, they had been given paid leave of absence, that it had never been done for a transgender person before, and that it would be unprecedented for the county to give him (Grimes) paid leave because of an unsafe situation at work because he was transgender. (Grimes Add. ¶ 37) Judkins testified that the Cook County jail is not a safe place for transgender people if they are not in the protective tier. (Grimes Add. ¶ 39) Barbara Pryor testified that she denied Grimes' request for a paid leave of absence, and that, prior to and in connection with making that decision, she consulted with EEO Director Nicholas Krasucki, who shared information with her about Grimes' case. (Grimes Add. ¶ 38)

**Argument.**

**I.   There is evidence from which the jury may conclude that Grimes was subjected to a hostile work environment, both severe and pervasive, for which the employer is responsible under Illinois law.**

"Do you know what it's like having somebody do this to you?"—Jackie Robinson

"No.  No.  You do.  . . .  Only you."—Branch Rickey

From the movie 42, starring Chadwick Boseman

When the author of this brief transitioned from male to female, I would go to court in a skirt suit, long hair, wearing mascara, dangly earrings, blush, and lipstick, and there were still a small number of judges and opposing counsel who knew me from before who would address me as "Sir" or "Mr. Wimmer" or "he" or "him."  Do cis-gender people have any idea how humiliating it is to be presenting as your true self and to be called "Sir" or "Mr. Wimmer"?  The

few who did this to me did it to mock me or to take away my gravitas. "We see right through you," "he's a silly person cross-dressing in court," "I don't recognize you as a real woman," "I don't recognize you as who you claim to be" were the unspoken messages. Calling a transgender person out of their gender is an epithet. The County cites *Young v. Illinois Human Rights Commission*, 2012 IL App (1st) 112204 (1st Dist. 2012) for the proposition that referring to a female plaintiff with masculine pronouns is not discriminatory. The County is trying to get a lot more out of *Young* than it stands for. First of all, *Young* did not involve a transgender complainant, but rather a cis-gender complainant. Second, the charge of discrimination in *Young* did not include a claim for hostile work environment, but rather discrimination in the terms and conditions of employment (denial of overtime, etc.). Young had testified that on one occasion, one of her supervisors referred to her with male pronouns, and she argued that the use of male pronouns on that one occasion was enough to conclude that the employment actions adverse to Young were motivated by a discriminatory animus. It was in that context that the Court stated that referring to Young once with masculine instead of feminine pronouns is not itself discriminatory. (*Young*, ¶ 44.) The Court was not stating or suggesting that calling a transgender employee out of their gender cannot give rise to a hostile work environment.

    Here, Grimes worked on a team of 14 people. (Grimes Add. ¶ 7) The supervisor of the team set the tone when, on a number of occasions, he mocked the transgender women detainees in the county jail by teasing the men on the med team when they would go to the tier with transgender detainees, by saying "you know you like that, that's your kind of woman," those types of comments. (Grimes Add. ¶ 40) The County argues that because these comments were not about Grimes, they cannot be deemed to contribute to a hostile work environment. That is not the law in Illinois. In *Village of Bellwood Board of Fire and Police Commissioners v.*

*Human Rights Commission*, 184 Ill. App. 3d 339, 351, 541 N.E.2d 1248 (1st Dist. 1989), the Appellate Court found that racially derogatory cartoons and a poster, which did not name the complainant, contributed to the creation of a hostile work environment. In the spring of 2018, three of the 14 members on Grimes' team began ignoring him even when he spoke to them, and that shunning continued until Grimes stopped reporting to work after September 28, 2018. (Grimes Add. ¶ 8) In *Village of Bellwood*, *supra*, the Court cited the fact that "the white officers with whom [Kincaid] was supposed to train refused to speak to him" (*Id.*, at 344 and 351) as a factor that contributed to the hostile environment. In the late spring or summer of 2018, on at least three occasions at work, Moishi Brittman, a member of the med team, referred to Grimes, who presents as unambiguously male, as "girl." (Grimes Add. ¶¶ 4, 9) Shirley McBride, a paramedic and coworker of Grimes, apparently felt comfortable mocking Grimes in front of other workers, when, in the late spring or early summer of 2018, McBride told Grimes, while laughing, "You really do have a big ass, don't you?" in front of paramedic Coffee and others. (Grimes Add. ¶ 10) And in August of 2018, as Grimes was walking within the Cook County jail compound, a nurse whose last name is Bradford told Grimes, referring to an unidentified individual who appeared to be female, "You see that. That's a man. People ought to tell who they really are. That's how people get killed." (Grimes Add. ¶ 11) The County argues that this latter incident could not have contributed to a hostile environment for Grimes because it was not directed to him. But it was. Grimes was, in the words and attitude of nurse Bradford, "a person who was not telling who they really are." These incidents of harassment at work were highly offensive to Grimes; they made him feel extremely uncomfortable when he had to walk around the Cook County jail compound, and they interfered, to an extent, with his work because, after the harassment started, Grimes no longer felt safe using the bathroom in the mens locker room

and he used the single occupancy bathrooms exclusively even when the bathroom in the mens locker room would have been more convenient. (Grimes Add. ¶ 13) The foregoing was hostile and offensive; Grimes work had been turned into a transphobic obstacle course in which he never knew what was next.  Then he found out that his supervisor was telling his coworkers that he was transgender.  The foregoing is sufficiently both severe and pervasive to constitute a hostile work environment.  See also *Sangamon County Sheriff's Department v. Illinois Human Rights Commission*, 233 Ill. 2d 125, 143-144, 908 N.E.2d 39 (2009) (hostile work environment found where there were six incidents from November of 1998 through February of 1999).

And, there is a more than sufficient basis for employer liability.  Grimes complained in writing about the harassment outlined above to the employer's EEO Director, Nicholas Krasucki. (Grimes Add. ¶ 24)  At Grimes' first meeting with Krasucki about Grimes' complaints, Grimes discussed the harassment in detail with Krasucki. (Grimes Add. ¶¶ 27, 28)  Yet, Krasucki limited his investigation to the matter of Judkins telling Healy, Bain-Norris, and Centeno that Grimes was transgender. (Grimes Add. ¶ 30) Krasucki did nothing about the harassment and hostile work environment described above, did not even investigate it, and when asked why he did not investigate it, all Krasucki could say was, "I can't answer that." (Grimes Add. ¶ 30, 31, 32, 33) In the case of nonsupervisory harassment, under Illinois law, the employer is liable if "it was aware of the conduct and failed to take reasonable corrective measures." (*Sangamon County*, *supra*, 233 Ill. 2d at 137.) That is what happened here.  And, under Illinois law, the employer is strictly liable for harassment by a managerial *or* a supervisory employee (775 ILCS 5/2-102(A)) regardless of whether or not they have any direct power over the employee involved.  (*Sangamon County*, 233 Ill. 2d at 137-142.)  Judkins, although not a managerial employee, was a supervisory employee.  He supervised the med team and Grimes.  (Grimes Add. ¶ 7) So the County is strictly

responsible for Judkins' conduct.

> **II. There is evidence from which the jury may conclude that, by not assigning Grimes to work in Division 6 because he is transgender, Grimes' employer segregated Grimes on the basis of his gender-related identity, and, under the Illinois Human Rights Act, there is no requirement for a plaintiff making a segregation claim to show an adverse employment action or deprivation of a job opportunity.**

The County first argues that Grimes will be unable to show segregation. That argument is without merit. First of all, it is not true that prior to mid-2018, med team employees were not assigned to a specific division. Judkins testified that "there was a gap where we did assignment sheets and then we didn't do assignments . . . for awhile and then we picked it back up again" in September 2018. (Grimes Resp. ¶ 19) Protective custody for transgender detainees was predominantly in Division 6 of the jail. (Grimes Add. ¶¶ 17, 22) On September 28, 2018, Judkins told Healy, Bain, and Centeno, "Logan is a transgender that's why he can't go to Division six." (Grimes Add. ¶ 18, 19, 20, 21) (See also Bain-Norris' testimony in Grimes Add. ¶ 22.) This is clearly segregation; the employer allows only cis-gender employees to work in certain locations. Picture a private manufacturer that will not allow African-American employees in certain areas of the plant.

The County's next argument is that Grimes' segregation claim fails because he cannot show an adverse employment action or deprivation of a job opportunity. In support, the County cites the Seventh Circuit's decision in *EEOC v. Autozone, Inc.*, 860 F.3d 564 (7th Cir. 2017), which Judges Wood, Rovner, and Hamilton criticized as approving of segregation by private employers so long as it was separate but equal. See *EEOC v. Autozone, Inc.*, 875 F.3d 860 (7th Cir. 2017), dissenting from denial of rehearing *en banc*. The federal *Autozone* decision is not much help in interpreting the Illinois Human Rights Act, however, because the statutes are considerably different when it comes to claims of segregation. The federal law has express

language making segregation in private employment illegal only if there are adverse employment consequences for the employee. The federal law makes it unlawful for an employer " to . . . segregate . . . his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect his status as an employee . . ." (*Id.*, 860 F.3d at 565.) The Illinois statute has no such language. The Illinois statute states, "It is a civil rights violation: (A) Employers. For any employer to refuse to hire, to segregate, to engage in harassment as defined in subsection (E-1) of Section 2-101, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination, citizenship status, or work authorization status." (775 ILCS 5/2-102.) Under the Illinois law, there is no language making segregation illegal only if it tends to deprive an employee of job opportunities or otherwise affects his status as an employee. Under the Illinois statute "segregation" is treated the same as "refusal to hire." They are both civil rights violations if they are based on unlawful discrimination. Illinois law does not allow separate but equal private employment facilities. Under Illinois law, segregation is a civil rights violation in and of itself, and a plaintiff alleging segregation is not required to prove an adverse employment action. In any case, here Grimes testified that, in his job interview for the CMT II position with the county, he discussed the fact that he had experience working with marginalized communities, including transgender people, and that working in Division 6, which houses transgender people, would be something that would be helpful to mention in connection with future job applications. (Grimes Resp. ¶ 28) So there is evidence here that the segregation tended to deprive Grimes of future job opportunities. Grimes should be able to continue with his segregation claim.

    **III. There is evidence from which the jury may conclude that the denial of Grimes' request for paid leave was discriminatory.**

The County argues that Grimes has no evidence that he was denied paid leave because he is transgender. That argument is without merit. Judkins testified that the Cook County jail is not a safe place for transgender people if they are not in the protective tier. (Grimes Add. ¶ 39) Grimes sought a paid leave due to the safety issue following Judkins' disclosure of Grimes' transgender status. (Grimes Resp. ¶ 51) Grimes had a meeting with Feroze Khan, who was the Leave Administration Manager for the Cook County Health & Hospitals System (County Stat. ¶ 51), in early November of 2018 at which the subject of paid leave came up. (Grimes Add. ¶ 36) At that meeting Feroze Khan told Grimes that, when nurses had been placed in an unsafe situation, that that was the discretion, they had been given paid leave of absence, that it had never been done for a transgender person before, and that it would be unprecedented for the county to give him (Grimes) paid leave because of an unsafe situation at work because he was transgender. (Grimes Resp. ¶ 58; Grimes Add. ¶ 37) Khan's statement was made by the County's employee on a matter within the scope of his employment relationship with the County while it existed, and, therefore, is admissible against the County under F.R.E. 801(d)(2). Khan's statement is an admission by the County that it had given paid leave to employees who had been placed in an unsafe situation, but that the County would not give Grimes paid leave because he is transgender. It is direct evidence of discriminatory intent in connection with the decision to deny Grimes paid leave. See *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 (7th Cir. 2005).

The County also argues that the denial of paid leave is not an adverse employment action. But, as this Court stated in its Memorandum Opinion and Order (Doc. 43) denying the Defendants' motion to dismiss, denial of paid leave "amounts to a diminishment of Grimes' 'compensation, benefits or other financial terms of employment' sufficient to support his discrimination and retaliation claims." (Doc. 43, p. 19.) Under the County's theory that denial

of paid leave is not an adverse employment action, it would be legal for a private company to award paid leave to white employees and unpaid leave to African-American employees under the same circumstances.

### III. There is evidence from which the jury may conclude that the denial of Grimes' request for paid leave was retaliatory.

Defendant County argues that there is no evidence that a retaliatory motive actually influenced the person who decided to deny the request. That is not true. Barbara Pryor testified that she denied Grimes' request for a paid leave of absence, and that, prior to and in connection with making that decision, she consulted with EEO Director Nicholas Krasucki, who shared information with her about Grimes' case. (Grimes Add. ¶ 38) Since the EEO Department never placed an employee on paid administrative leave due to a complaint the employee filed (County Stat. ¶ 59), Grimes' EEO complaint should have been irrelevant to his request for paid leave. The fact that the decision-maker consulted Krasucki about the proceedings on Grimes' complaint in connection with her decision to deny his request for paid leave is evidence that the denial was motivated by Grimes' complaint. See *Carter v. University of South Alabama Children's & Women's Hospital*, 510 F.Supp.2d 596, 610-611 (S.D.Ala. 2007) (at job interview, decision-maker's inquiry as to earlier complaint of sexual harassment was support for the denial of summary judgment on this issue of causation in retaliation case). And, as noted above, denial of paid leave is an adverse employment action.

**Conclusion.** This Court should deny the County's motion for summary judgment.

JOANIE RAE WIMMER  
Attorney at Law  
715 Lake Street, Suite 516  
Oak Park, Illinois 60301  
(630) 810-0005  
jwimmerlaw@sbcglobal.net  
Attorney No. 3125600

Respectfully submitted,

_____/s/ Joanie Rae Wimmer_____  
Joanie Rae Wimmer