UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LOGAN M. GRIMES, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 6091 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| COUNTY OF COOK, an Illinois county, d/b/a COOK | ) | |
| COUNTY HEALTH & HOSPITALS SYSTEM and/or | ) | |
| CERMAK HEALTH SERVICES, and MELVIN | ) | |
| JUDKINS, in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Logan Grimes brought this suit against Cook County and Melvin Judkins, his former

employer and supervisor, alleging violations of 42 U.S.C. § 1983 and Illinois law.  Doc. 13.  The

court earlier in the litigation denied Defendants' motion to dismiss.  Docs. 42-43 (reported at 455

F. Supp. 3d 630 (N.D. Ill. 2020)).  With discovery closed, Defendants move separately for

summary judgment and jointly to bar the opinions of Grimes's expert.  Docs. 109, 112, 114.

Defendants' motion to bar Grimes's expert is granted in part and denied in part, Judkins's

summary judgment motion is denied, and the County's summary judgment motion is granted in

part and denied in part.

**Background**

The court recites the facts as favorably to Grimes as the record and Local Rule 56.1

allow.  *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).  At this

juncture, the court must assume the truth of those facts, but does not vouch for them.  *See Gates*

*v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

1

Grimes is a transgender man. Doc. 134 at ¶¶ 1-7; Doc. 132 at ¶¶ 1-6. He was diagnosed with gender identity disorder (now known as gender dysphoria) in 2000, began hormone therapy in 2003, and underwent surgery in 2004 and 2006. Doc. 134 at ¶¶ 2-3; Doc. 132 at ¶¶ 2-3. As a result, Grimes has appeared unambiguously male since 2008. Doc. 134 at ¶ 4; Doc. 132 at ¶ 4. From 2008 to 2018, he kept his transgender status private by not disclosing it to anyone except family members. Doc. 134 at ¶ 7; Doc. 132 at ¶ 6. Prior to 2008, however, Grimes spoke with the *Windy City Times* or a similar publication about his transition. Doc. 134 at ¶ 8; Doc. 122 at ¶ 16. No record evidence establishes what, if anything, was published regarding his transition.

From February 2013 through February 2020, the County employed Grimes as a Correctional Medical Technician ("CMT") II at Cook County Jail. Doc. 122 at ¶ 1; Doc. 127 at ¶ 2. Grimes was part of the Medication Team ("Med Team"), which dispensed medications, responded to medical emergencies, and conducted health assessments on detainees. Doc. 127 at ¶ 12. He frequently worked by himself. Doc. 134 at ¶ 35.

Judkins supervised Grimes and other members of the Med Team. Doc. 132 at ¶¶ 7, 14, 18, 24; Doc. 132 at ¶ 7; Doc. 122 at ¶ 3. While "Judkins was responsible for overseeing the work of the CMT IIs on the Med Team, including [Grimes]," he lacked "the authority to hire, fire, transfer, or discipline employees." Doc. 127 at ¶¶ 13-14. For at least part of Grimes's tenure at the Jail, Judkins assigned Med Team members to different divisions. *Id*. at ¶¶ 19, 22. Grimes asked to be assigned to Division 6, *id*. at ¶ 24, where transgender detainees were held in protective custody, Doc. 132 at ¶¶ 17, 22.

Judkins did not assign Grimes to Division 6. Doc. 127 at ¶ 25. Instead, in late September 2018, Judkins told Med Team members that Grimes could not go to Division 6 because he was transgender. Doc. 132 at ¶¶ 21-22. In so doing, Judkins revealed Grimes's

transgender status to several of his co-workers, at least two of whom were previously unaware of it. Doc. 134 at ¶¶ 15, 19-20. (At least one co-worker was previously aware that Grimes was transgender. *Id*. at ¶ 14; Doc. 122 at ¶ 15.) Judkins acknowledges that Grimes's transgender status was private information that should not be disclosed without his permission, which he did not give. Doc. 134 at ¶¶ 21, 33. Judkins also acknowledges that the Jail was unsafe for transgender detainees who were not in the protective tier. *Id*. at ¶ 34.

Judkins avers that he learned that Grimes is transgender from a rumor at work, not from his personnel file. Doc. 122 at ¶¶ 4, 18-19. Grimes counters that assertion with facts casting doubt on Judkins's credibility. *Ibid*. Grimes's view of the facts prevails at this stage, *see Jones v. Van Lanen*, 27 F.4th 1280, 1286 (7th Cir. 2022) (recognizing "that circumstantial evidence may be enough to survive summary judgment if that evidence could allow a jury to draw a reasonable inference in support of the non-moving party," including on credibility issues), but the fact dispute is immaterial. As shown below, Judkins may be liable for disseminating Grimes's confidential information even if he did not learn of Grimes's transgender status from his personnel file.

Grimes learned in early October 2018 that Judkins had disclosed his transgender status to his co-workers. Doc. 127 at ¶ 37. Grimes immediately stopped reporting to work, citing fear for his safety. *Id*. at ¶¶ 48, 71. Some two weeks later, Grimes wrote to the Cook County Health and Hospital System's Equal Employment Opportunity ("EEO") Director, Nicholas Krasucki. Doc. 132 at ¶ 23. In that email and in their subsequent meeting, Grimes described other experiences that he perceived as gender identity-based harassment from co-workers. *Id*. at ¶¶ 24, 27. Those experiences included the following: three members of the fourteen-person Med Team had begun ignoring Grimes when he spoke to them, *id*. at ¶ 8; one Med Team member called

Grimes "girl" at least three times, *id.* at ¶ 9; and a nurse told Grimes, in reference to someone who appeared to be female, "You see that. That's a man. People ought to tell you who they really are. That's how people get killed," *id.* at ¶ 11. Those experiences made Grimes feel unsafe using the bathroom in the men's locker room, so he used less convenient single occupancy bathrooms instead. *Id.* at ¶ 13.

Grimes's union filed a grievance on his behalf, which was forwarded to the EEO Department for investigation. Doc. 127 at ¶ 40. The investigation resulted in a written reprimand for Judkins but no other discipline. *Id.* at ¶¶ 46-47.

Shortly after his email to Krasucki, Grimes requested a paid leave of absence, citing his EEO complaint, the grievance, and his concern for his safety. *Id.* at ¶ 51. In an early November 2018 meeting, Feroze Khan, the leave administration manager, told Grimes that nurses in unsafe situations had received discretionary, paid leaves of absence. Doc. 132 at ¶¶ 36-37. Khan indicated, however, that Grimes's situation was different because he is transgender. *Id.* at ¶ 37; Doc. 127-2 at 95 (352:22-353:3) (Grimes's testimony that Khan said "the difference [between Grimes and the nurses who received paid leave] … would probably be … because he knew [Grimes] was transgender, [and it would be] unprecedented that they would grant that"). Grimes's leave request was formally denied later in November. Doc. 127 at ¶ 53. Human Resources Chief Barbara Pryor made that decision after consulting with Krasucki. Doc. 132 at ¶ 38.

Grimes remained on unapproved, unpaid leave, but continued to meet with the County about whether and under what conditions he would return to work. Doc. 127 at ¶¶ 62-65, 69. The County offered to place Grimes in vacant positions at locations outside Cook County Jail, but he did not accept. *Id.* at ¶¶ 66-68. Although Grimes was never disciplined for his absence

and could have returned to work at the Jail at any point, he remained on unapproved, unpaid leave until his resignation in February 2020. *Id*. at ¶¶ 71-72.

## Discussion

### I. Defendants' Motion to Bar Grimes's Expert

Defendants move under Evidence Rule 702 to bar the testimony, report, and opinions of Dr. Ashley Austin, whom Grimes offers as an expert on gender dysphoria and healthcare for transgender individuals. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-95 (1993); *Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013) ("[T]he *Daubert* analysis applies to *all* expert testimony under Rule 702, not just scientific testimony.") (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

Rule 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The district court serves as the "gate-keeper who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert," *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (internal quotation marks omitted), and "has 'broad latitude' to determine how to evaluate expert testimony," *United States v. Hill*, 818 F.3d 289, 297 (7th Cir. 2016) (quoting *Kumho Tire*, 526 U.S. at 153). The expert's proponent bears the burden of proving by a preponderance of the evidence that the expert's testimony satisfies Rule 702. *See United States v. Saunders*, 826 F.3d 363, 368-69 (7th Cir. 2016); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

### A.     Confidential Medical Information

Dr. Austin first opines that Judkins's disclosure of Grimes's transgender status "is tantamount to the disclosure … of Mr. Grimes' confidential medical information."  Doc. 112-1 at 3.  Dr. Austin explains that because Grimes was able to pass—that is, be perceived by others and consistently be treated as a man—disclosing his transgender status necessarily revealed "his issues with gender dysphoria, the corresponding gender dysphoria diagnosis, and the confidential medical interventions he has accessed and/or continues to access in order to alleviate his gender dysphoria and affirm his masculine gender identity."  *Id*. at 3-4.  Defendants submit that Dr. Austin's opinion is improper "because it goes directly to the merits of Plaintiff's complaint, specifically the substantive due process claim," which concerns "whether Plaintiff's transgender status constitutes confidential medical information."  Doc. 112 at 11.

"An opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a).  Under Rules 403, 701, and 702, however, the court may "exclude opinions phrased in terms of inadequately explored legal criteria."  Fed. R. Evid. 704 advisory committee's note; *see Roundy's Inc. v. NLRB*, 674 F.3d 638, 648 (7th Cir. 2012) ("Rules 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case.") (emphasis added) (internal quotation marks omitted).  Portions of Dr. Austin's report appear to address a claim-dispositive *legal* issue: whether Judkins revealed confidential medical information when he disclosed Grimes's transgender status to his co-workers.  That opinion, as so phrased, is inadmissible.

That said, Dr. Austin's opinions regarding whether "anybody informed of [Grimes's] transgender status would necessarily know of his gender dysphoria and prior medical interventions," 455 F. Supp. 3d at 638, and whether one's transgender status is information "that most people are reluctant to disclose to strangers," *ibid*., are admissible.  Doc. 112-1 at 3-4 (Dr.

Austin explaining that because Grimes "is very obviously male presenting," disclosing his transgender status would reveal that he had gender-affirming medical interventions allowing him to pass as a man, interventions that required a clinical diagnosis of gender identity disorder or gender dysphoria); *id*. at 3 (explaining why transgender people might not disclose their transgender status).  Those opinions address factual rather than legal matters, even though they bear on questions central to Grimes's due process claim.  *See* Fed. R. Evid. 704 advisory committee's note ("[T]he question, 'Did T have capacity to make a will?' would be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed.").  And Dr. Austin's report discloses a reliable methodology by which she could address those matters.  Doc. 112-1 at 3, 7-8 (Dr. Austin explaining that her opinions follow from her review of the academic literature and medical standards of care).

Accordingly, Defendants' motion to bar is granted in part and denied in part as to Dr. Austin's first set of opinions.

### B.  Emotional Distress

Dr. Austin's second opinion is "that the disclosure of an individual's transgender status to others who are unaware of this person's transgender identity/status has the potential to cause significant emotional distress and exacerbate the individual's gender dysphoria."  Doc. 112-1 at 4.  This opinion is grounded in Dr. Austin's review of medical and social scientific literature, *id*. at 6, 8-9, and thus is the product of a reliable methodology.  *See Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996) (approving an expert's "review of experimental, statistical, or other scientific data generated by others in the field").

Defendants nonetheless argue that Dr. Austin's opinion would not assist the factfinder because it does not address whether Grimes *himself* suffered emotional distress or exacerbated

gender dysphoria.  Doc. 112 at 13.  True enough, but this opinion could still assist the factfinder by providing context for whether Grimes's experiences *could* have caused him emotional distress or exacerbated his gender dysphoria.  Accordingly, the motion to bar is denied as to Dr. Austin's second opinion.

### C.    Transphobic Culture

To the extent Dr. Austin opines that "transphobic attitudes and beliefs … permeated the culture" at Cook County Jail, Doc. 112-1 at 3, Grimes disclaims that opinion, Doc. 120 at 10 (suggesting that Dr. Austin's statement "was not an expert opinion" and "her opinion that Judkins' disclosure of Grimes' transgender status to his co-workers was tantamount to the disclosure of confidential medical information would have been the same whether or not there was a culture of transphobia at the Cook County jail").  Defendants' motion to bar is therefore granted insofar as it relates to any opinion about a culture of transphobia at the Jail.

## II.    Defendants' Summary Judgment Motions

Grimes asserts a single § 1983 claim, brought against Judkins, for disclosure of confidential medical information in violation of the Fourteenth Amendment.  Doc. 13 at pp. 1-8.  Grimes also asserts state common law tort claims against Judkins for invasion of privacy and intentional infliction of emotional distress ("IIED"), and claims against the County under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq*.  Doc. 13 at pp. 8-41.

### A.    Section 1983 Claim

As this court observed in its earlier opinion, the Fourteenth Amendment's Due Process Clause protects a "fundamental right … 'to the privacy of medical, sexual, financial, and perhaps other categories of highly personal information—information that most people are reluctant to disclose to strangers.'"  455 F. Supp. 3d at 638 (quoting *Wolfe v. Schaefer*, 619 F.3d 782, 785 (7th Cir. 2010)).  That "right is defeasible only upon proof of a strong public interest in access to

or dissemination of the information." *Ibid.* (quoting *Wolfe*, 619 F.3d at 785). Judkins does not argue that any public interest justified his disclosure of Grimes's transgender status. Thus, to prevail on this claim, Grimes must show that "(1) Judkins disclosed to others (2) his private medical information (3) without his permission." *Ibid.* Of those elements, the parties dispute only whether Judkins revealed Grimes's private medical information; if the answer to that question is yes, the parties further dispute whether Judkins is entitled to qualified immunity. Doc. 115 at 5-8; Doc. 142 at 2-6.

### 1.     Disclosure of Private Medical Information

Judkins contends that Grimes lacks evidence "that his medical information or records were released by Mr. Judkins." Doc. 115 at 6. That is incorrect. Judkins disclosed Grimes's transgender status to his co-workers, at least some of whom were previously unaware of that fact. Doc. 134 at ¶¶ 12, 15-19. The disclosure of such information can give rise to a due process violation even if no tangible medical document or record is revealed. *See Wolfe*, 619 F.3d at 785 (referring to the "right to the privacy of medical, sexual, financial, and perhaps other categories of highly personal *information*") (emphasis added); *see also Doe v. City of New York*, 15 F.3d 264, 265-67 (2d Cir. 1994) (holding that the disclosure of a person's HIV status plausibly violated that person's constitutional privacy right). Judkins does not cite, and the court cannot find, any case suggesting that a defendant must disclose underlying records documenting the plaintiff's medical condition to violate his due process privacy right in his private medical information. And a person's transgender status is highly confidential, personal medical information, particularly where, as here, he has received an accompanying diagnosis and medical treatment. 455 F. Supp. 3d at 638 ("Gender dysphoria is a medical condition under governing precedent and according to the psychiatric community.") (citations omitted); *see Powell v.*

*Schriver*, 175 F.3d 107, 111-12 (2d Cir. 1999) (holding that "the Constitution does indeed protect the right to maintain the confidentiality of one's [transgender status]").

Second, Judkins contends that Grimes's claim is defeated by the fact that he did not learn of Grimes's transgender status from Grimes's personnel file. Doc. 115 at 6; Doc. 137 (counsel's argument at the motion hearing). As noted, Grimes disputes Judkins's assertion that Judkins learned of Grimes's transgender status from a rumor. Doc. 122 at ¶¶ 18-19. But even putting aside that dispute, Jenkins cites no authority for a *per se* rule that a plaintiff's due process informational privacy right depends on whether the defendant obtained the plaintiff's personal information from a personnel file or some comparable source. Rather, as the Seventh Circuit made clear in *Wolfe*, due process protects two conceptually related, but distinct, informational privacy rights: the first restricts the government's "access to" confidential information, and the second governs the government's "dissemination of" that information. *Wolfe*, 619 F.3d at 785 (holding that the Constitution protects the "right to the privacy of medical, sexual, financial, and perhaps other categories of highly personal information … defeasible only upon proof of a strong public interest in access to *or* dissemination of the information") (emphasis added); *see also Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 789-90 (9th Cir. 2002) ("[T]he right to 'informational privacy' applies both when an individual chooses not to disclose highly sensitive information to the government and when an individual seeks assurance that such information will not be made public.") (citation omitted); Helen L. Gilbert, Comment, *Minors' Constitutional Right to Informational Privacy*, 74 U. Chi. L. Rev. 1375, 1384 (2007) (explaining that informational privacy covers both "the government's collection of an individual information" and "the sharing of an individual's information by the government") (cited with approval in *Wolfe*, 619 F.3d at 785). As a result, a government official's disclosure of a plaintiff's private

information can support liability even if the information was lawfully collected or accessed. Because Grimes's claim centers on the dissemination of his confidential medical information, whether Judkins obtained that information from a personnel file is immaterial.

Still, if Judkins learned about Grimes's transgender status from a public source, that could bear on whether his status was "private" or "confidential" information—particularly if Grimes himself had made his status a matter of public record. *See Chasensky v. Walker*, 740 F.3d 1088, 1097 (7th Cir. 2014) (holding that a financial information privacy claim failed because the information was publicly available in court records and thus "not private"); *Willan v. Columbia Cnty.*, 280 F.3d 1160, 1163 (7th Cir. 2002) (noting that the constitutional privacy right protects against "the revelation of intensely private financial or medical information that [is] not a matter of public record"); *see also Powell*, 175 F.3d at 112 n.1 (noting that the confidentiality of a plaintiff's transgender status "may be subject to waiver"). Likewise, evidence that some of Grimes's co-workers were aware of his transgender status prior to Judkins's disclosure thereof, Doc. 122 at ¶ 15; Doc. 134 at ¶ 14, may tend to negate his privacy interest.

All that said, the court cannot say on the present record that Grimes's due process claim fails as a matter of law. Taking the facts in the light most favorable to Grimes, he has attempted to keep his transgender status private since 2008. Doc. 134 at ¶ 7. Even if those efforts were imperfect, the court cannot conclude on summary judgment that his status indisputably was "a matter of public record." *Willan*, 280 F.3d at 1163. Accordingly, a jury must decide whether Judkins revealed Grimes's "confidential" or "private" medical information.

### 2. Qualified Immunity

"Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Taylor v. Ways*, 999 F.3d 478, 487 (7th Cir. 2021) (internal quotation marks omitted). "Whether qualified immunity applies turns on two questions: first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021). "These questions may be addressed in either order." *Ibid*. As to the first question, taking the facts in the light most favorable to Grimes, Judkins violated his due process rights by disclosing his transgender status for the reasons set forth above.

As to the second question, a right is clearly established if "there is a closely analogous— though not necessarily identical—case identifying that right." *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019). This court previously held that "[t]he law was clearly established by late September 2018, when Judkins made the disclosure, that there is a substantive due process right to medical privacy." 455 F. Supp. 3d at 639-40 (citing *Denius v. Dunlap*, 209 F.3d 944, 956-57 (7th Cir. 2000)). Two decades ago, the Seventh Circuit reversed a grant of qualified immunity as to the release of private medical information where the defendant "provided no interest … that would justify" that incursion on the plaintiff's privacy right. *Denius*, 209 F.3d at 957. Judkins does not argue that any public interest justified his disclosure of Grimes's transgender status; in fact, he concedes that a person's transgender status is private information that should not be disclosed without that person's consent. Doc. 134 at ¶ 33; *see Powell*, 175 F.3d at 111 ("The excru[c]iatingly private and intimate nature of [being transgender], for persons who wish to preserve privacy in the matter, is really beyond debate."). Accordingly, no reasonable person in Judkins's position could have believed that disclosing Grimes's transgender

status without his consent was lawful in the absence of any public interest in the disclosure. It follows that Judkins is not entitled to qualified immunity on Grimes's § 1983 claim.

Judkins's reply brief suggests that only Supreme Court decisions can clearly establish the law for purposes of qualified immunity. Doc. 142 at 4 n.1. That argument is forfeited because it was raised for the first time in a reply brief. *See O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) ("[W]e have repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived."); *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."). The argument is meritless in any event. As the Seventh Circuit explained: "To determine whether a right is clearly established we look to controlling precedent from *both the Supreme Court and this circuit*, and if there is no such precedent we cast a wider net and examine *all relevant case law* to determine whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 731 (7th Cir. 2013) (emphasis added) (internal quotation marks omitted); *accord Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018). Here, *Denius* clearly establishes a due process medical privacy right, and *Powell* establishes that the right applies to a person's transgender status.

## B.     State Law Claims

### 1.     Claims Against Judkins

#### a.     Invasion of Privacy/Public Disclosure of Private Facts

To prevail on an invasion of privacy claim for the public disclosure of private facts, "the plaintiff must prove that (1) the defendant gave publicity (2) to the plaintiff's private and not public life (3) and that the matter made public was highly offensive and (4) not of legitimate public concern." *People v. Austin*, 155 N.E.3d 439, 460 (Ill. 2019); *accord Karraker v.*

*Rent-A-Ctr., Inc.*, 411 F.3d 831, 838 (7th Cir. 2005). Judkins contests the first three elements in

seeking summary judgment on Grimes's common law invasion of privacy claim.

As to the first element, Judkins notes that his disclosure of Grimes's transgender status

was confined to a few co-workers and was not made to the "public at large." Doc. 115 at 8. But

as the Seventh Circuit has explained, "[t]he publicity requirement is satisfied by disclosure to a

limited number of people if those people have a special relationship with the plaintiff that makes

the disclosure as devastating as disclosure to the public at large." *Karraker*, 411 F.3d at 838.

Under that rule, disclosing a "medical condition" to "fellow employees" satisfies the publicity

requirement. *Miller v. Motorola, Inc.*, 560 N.E.2d 900, 903 (Ill. App. 1990). Judkins's

disclosure to Grimes's co-workers, some of whom were previously unaware that Grimes was

transgender, Doc. 134 at ¶¶ 15, 19-20, thus meets the special relationship test.

As to the second and third elements, Judkins argues that Grimes's transgender status was

not a "private" fact, and that any disclosure was not offensive, because Grimes himself had

previously disclosed his status. Doc. 115 at 9. As noted, before Judkins's disclosure, at least one

of Grimes's co-workers heard that Grimes was transgender, Doc. 122 at ¶ 15; Doc. 134 at ¶ 14,

and before 2008 Grimes shared the story of his transition with a publication, Doc. 122 at ¶ 16;

Doc. 134 at ¶ 8. When a plaintiff *voluntarily* discloses private medical facts to co-workers, those

facts "lo[se] their private nature." *Wynne v. Loyola Univ. of Chi.*, 741 N.E.2d 669, 677 (Ill. App.

2000). But there is no evidence that Grimes voluntarily disclosed his transgender status to his

co-workers at the Jail. Doc. 134 at ¶ 7; Doc. 116-3 at 58 (221:1-221:7) (Grimes's testimony that

prior to September 2018, he had never had a conversation about his transgender status with the

co-worker who had become aware of it before Judkins's disclosure). And although Grimes had

spoken with a publication about his transition, Doc. 122 at ¶ 16; Doc. 134 at ¶ 8, that

14

conversation occurred before 2008, when Grimes began keeping his status private, and the record lacks evidence of what, if anything, was ultimately published. On this record, the privacy of Grimes's transgender status is a disputed issue of fact for the jury. *See U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989) ("[T]he extent of the protection accorded a privacy right at common law rested in part on the degree of dissemination of the allegedly private fact and the extent to which the passage of time rendered it private.").

Accordingly, Judkins is not entitled to summary judgment on Grimes's invasion of privacy claim.

### b. Intentional Infliction of Emotional Distress

The IIED tort has three elements: "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress." *Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 63 (Ill. 2016). Judkins submits that his conduct was not extreme or outrageous, and that he did not know his disclosure of Grimes's transgender status would cause Grimes to suffer severe emotional distress. Doc. 115 at 11. Neither argument persuades, at least on summary judgment.

As to whether Judkins's conduct was extreme or outrageous, the parties do not identify case law addressing whether revealing a person's transgender status can predicate an IIED claim. As the Second Circuit has observed, however, "[t]he excru[c]iatingly private and intimate nature of [being transgender], for persons who wish to preserve privacy in the matter, is really beyond debate." *Powell*, 175 F.3d at 111. And Dr. Austin opines that "the disclosure of an individual's transgender status to others who are unaware of this person's transgender identity/status has the

potential to cause significant emotional distress and exacerbate the individual's gender dysphoria." Doc. 134 at ¶ 31. Accordingly, a reasonable jury could find that revealing a person's transgender status without that person's permission is "so extreme as to go beyond all possible bounds of decency." *Dixon v. Cnty. of Cook*, 819 F.3d 343, 351 (7th Cir. 2016) (citation omitted).

As to Judkins's knowledge of the consequences of his actions, a reasonable jury could infer that he knew there was a high probability that his conduct could cause Grimes to suffer severe emotional distress: Judkins acknowledged that "someone's transgender status [is] private information which should not be disclosed to others without [that person's] permission," Doc. 134 at ¶ 33, and that Grimes had never given him permission to share that fact, *id.* at ¶ 21. Moreover, Judkins's belief that the Jail was unsafe for transgender detainees could support an inference that he also believed it was unsafe for transgender staff members who worked by themselves, as Grimes often did. *Id.* at ¶¶ 34-35. Thus, a jury could conclude that Judkins knew his disclosure of Grimes's status would create, at a minimum, a high probability that Grimes would fear for his safety and suffer emotional distress.

### c.    Tort Immunity Act

Judkins argues that the Illinois Local Governmental and Governmental Employee Tort Immunity Act, 745 ILCS 10/2-210, protects him from liability on Grimes's state law claims. To successfully invoke Section 2-210 immunity, Judkins must "show that (1) [he] was a public employee who (2) provided information while (3) acting within the scope of [his] employment." *Masters v. Murphy*, 176 N.E.3d 911, 916 (Ill. App. 2020). Grimes contests only whether Judkins acted within the scope of his employment. Doc. 124 at 15.

Judkins's actions fall within the scope of his employment only if they were (1) "of the kind he [was] expected to perform," (2) "substantially within the authorized time and space limits," and (3) "actuated, at least in part, by a purpose to serve" his employer. *Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 992 (Ill. 2007) ("[A]ll three criteria … must be met to conclude that an employee was acting within the scope of employment."). To support the proposition that his disclosure of Grimes's transgender status fell within the scope of his employment, Judkins relies solely on the fact that the disclosure occurred during the workday at his place of employment. Doc. 115 at 12 ("No action alleged occurred outside of work or beyond the confines of [Judkins's] employment at the Jail."); Doc. 142 at 9 (same). That fact, standing alone, fails to establish that the disclosure was the kind of action that he was expected to perform and that was designed to serve his employer. Having failed to address two of the three factors that define the scope of his employment, Judkins has not shown he is entitled to immunity under Section 2-210.

### 2. Claims Against Cook County

The IHRA prohibits employment discrimination based on gender identity. *See* 775 ILCS 5/1-103(Q) ("'Unlawful discrimination' means discrimination against a person because of his or her actual or perceived … sexual orientation … ."); *id.* § 5/1-103(O-1) ("'Sexual orientation' means actual or perceived … gender-related identity, whether or not traditionally associated with the person's designated sex at birth."). Grimes's IHRA claims against the County alleged that it subjected him to a hostile work environment, segregated him by not assigning him to Division 6, discriminated against him by denying him paid leave, and retaliated against him for filing an EEO complaint, all due to his gender identity. Doc. 13 at pp. 17-41. Except as noted below,

"Illinois courts apply the federal Title VII framework to claims of discrimination made under the [IHRA]." *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017).

### a.     Hostile Work Environment

"To prove that an employment environment was actionably hostile, a plaintiff must show that (1) he was subject to unwelcome harassment; (2) the harassment was based on … [a] protected category[]; (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Gates*, 916 F.3d at 636 (internal quotation marks omitted). The County contests only the third and fourth elements. Doc. 110 at 4-9; Doc. 131 at 2-9.

As to the third element, the County argues that any harassment Grimes experienced was not severe or pervasive. Doc. 110 at 4-8; Doc. 131 at 2-6. Although a reasonable jury ultimately could reach that conclusion, the severity and pervasiveness of Grimes's harassment are triable issues. *See Johnson*, 892 F.3d at 901 ("Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury. In order to remove such a question of fact from the jury on summary judgment, the court would have to determine that no reasonable jury could find the conduct at issue severe or pervasive.") (citations omitted). Judkins's disclosure that Grimes is transgender weighs heavily in Grimes's favor. *See Membreno v. Atlanta Rest. Partners, LLC*, 517 F. Supp. 3d 425, 442 (D. Md. 2021) (denying summary judgment on a hostile work environment claim where the plaintiff's manager revealed to the plaintiff's co-workers that the plaintiff was transgender); *Roberts v. Clark Cnty. Sch. Dist.*, 215 F. Supp. 3d 1001, 1017 (D. Nev. 2016) (similar). Three of Grimes's fourteen team members ceased speaking to him, Doc. 132 at ¶ 8, which could be considered behavior "designed to ostracize" him. *See Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013) (holding that a

plaintiff's hostile work environment claim survived summary judgment in part because "her colleagues were forbidden from speaking to her"). That a co-worker misgendered Grimes by calling him "girl" several times also supports his claim. *See Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 129 (E.D. Pa. 2020) (holding that co-workers' repeated misgendering of a transgender plaintiff supports a hostile work environment claim). And although Grimes was not personally the target of the nurse's comment to him that transgender "[p]eople ought to tell you who they really are" because not doing so is "how people get killed," Doc. 132 at ¶ 11, that remark could be understood as "target area" harassment given that "a group of which [Grimes] was a member was being vilified." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007) (holding that target area harassment can contribute to a hostile work environment). Taking these incidents as a whole, a reasonable jury could conclude that Grimes experienced severe or pervasive harassment. *See EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 626 (7th Cir. 2018) ("[C]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive.") (citation omitted).

As to the fourth element, employer liability, the County argues that because Judkins was not *Grimes's* manager or supervisor, it can be liable "only if it was aware of the [harassing] conduct and failed to take reasonable corrective measures." Doc. 110 at 9 (quoting *Sangamon Cnty. Sheriff's Dep't v. Ill. Hum. Rts. Comm'n*, 908 N.E.2d 39, 45 (Ill. 2009)); Doc. 131 at 9. But employers are strictly liable under the IHRA for sexual harassment by a "supervisory employee" even if "the supervisor has no authority to affect the terms and conditions of *the complainant's* employment." *Sangamon Cnty.*, 908 N.E.2d at 45 (emphasis added); *see also Nischan v. Stratosphere Qual., LLC*, 865 F.3d 922, 931 (7th Cir. 2017) (explaining that, under

the IHRA, the fact that "the harasser possessed general supervisory powers was enough to make the employer strictly liable"); *Hilgers v. Rothschild Inv. Corp.*, 2017 WL 4164036, at *8 (N.D. Ill. Sept. 20, 2017) ("[U]nder the IHRA, a person is a supervisor as long as he or she works for the employer in some general supervisory role. As such, direct supervisory authority that makes someone a supervisor for purposes of Title VII is sufficient but not necessary to make someone a supervisor for purposes of the IHRA.") (citation omitted); *cf. Johnson*, 892 F.3d at 905 ("Under Title VII … a supervisor is the one with the power to directly affect the terms and conditions of employment. This power includes the authority to hire, fire, promote, demote, discipline or transfer a plaintiff.") (internal quotation marks omitted). Accordingly, the fact that Judkins lacked "the authority to hire, fire, transfer or discipline" *Grimes*, Doc. 127 at ¶ 14, is immaterial so long as he had general supervisory powers.

Some record evidence suggests that Judkins had such powers: Judkins described himself as a supervisor, Doc. 132 at ¶ 7; Doc. 122 at ¶ 3; Grimes and two other Med Team employees described Judkins as their supervisor, Doc. 132 at ¶¶ 14, 18, 24; and the County concedes that "Judkins was responsible for overseeing the work of the CMT IIs on the Med Team, including [Grimes]," Doc. 127 at ¶ 13. Although the precise contours of Judkins's supervisory responsibilities are unclear, the evidence suffices to create a triable issue as to whether he had "general supervisory powers," and thus whether the County is strictly liable under the IHRA.

### b. Segregation

The IHRA prohibits "segregat[ion] … on the basis of unlawful discrimination." 775 ILCS 5/2-102(A). Taking the evidence in the light most favorable to Grimes, Judkins refused to assign Grimes to Division 6—the predominant location for protective custody for transgender detainees, Doc. 132 at ¶ 17, 22—because of his gender identity. *Id*. at ¶¶ 21-22; Doc. 127 at

¶ 29.  Although the County retorts that "[t]here were other potential reasons for Plaintiff not being assigned to Division 6," Doc. 110 at 10, a jury must determine why Judkins did not assign Grimes to Division 6.

The County cites *EEOC v. AutoZone, Inc.*, 860 F.3d 564 (7th Cir. 2017), for the proposition that Grimes must "show an adverse employment action or deprivation of a job opportunity for a segregation claim."  Doc. 131 at 9.  In *AutoZone*, the Seventh Circuit applied Title VII, which forbids employers from "segregat[ing] … employees … in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee."  860 F.3d at 568 (quoting 42 U.S.C. § 2000e-2(a)(2)).  Grimes's claim arises under the IHRA, which does not include the precise Title VII language—that unlawful segregation must "deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee"—that *AutoZone* applied.  *See* 775 ILCS 5/2-102(A).

That textual difference between the IHRA and Title VII must be given effect.  *See W. Ill. Univ. v. Ill. Educ. Lab. Rels. Bd.*, 184 N.E.3d 249, 260 (Ill. 2021) (recognizing that another jurisdiction's "interpretation of its [analogous] statute is relevant" when interpreting an Illinois law, but "distinguish[ing] it where it departs from the [Illinois statute's] language and structure"); *see also Kleber v. CareFusion Corp.*, 914 F.3d 480, 484 (7th Cir. 2019) (explaining that courts must "take statutes as we find them by giving effect to differences in meaning evidenced by differences in language").  Although Illinois courts ordinarily construe the IHRA to accord with Title VII, *see Zaderaka v. Ill. Hum. Rts. Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989), an exception arises when the two statutes materially differ.  *See Sangamon Cnty.*, 908 N.E.2d at 46 (holding that federal decisions interpreting Title VII are "unhelpful" where the IHRA's text

differs from Title VII's). Accordingly, under the IHRA, segregation is actionable even if it does not tend to deprive a plaintiff of employment opportunities or otherwise adversely affect his employment status.

In any event, record evidence supports Grimes's view that being excluded from Division 6 tended to deprive him of employment opportunities. Doc. 127 at ¶ 28. Grimes testified that, when interviewing for his position at the Jail, he discussed his experience working with transgender and other marginalized communities. Doc. 111-2 at 45 (327:15-327:20). That testimony could lead a reasonable jury to credit Grimes's belief that other potential employers would look favorably on applicants who had experience working with the transgender detainees in Division 6. *Ibid.* (327:21-328:5); *cf. AutoZone*, 860 F.3d at 569-70 (affirming summary judgment on a Title VII segregation claim where no evidence showed that a job transfer "even *tended* to deprive" the employee "of any job opportunity"). Other record evidence supports the County's contrary view, Doc. 127 at ¶¶ 12, 18, but at this stage the court must resolve all evidentiary disputes in Grimes's favor.

### c. Discrimination

Grimes's discrimination claim likewise survives summary judgment. Grimes testified that the leave administration manager, Khan, told him that nurses in unsafe situations had been given paid leave, and that Grimes was treated differently because he is transgender. Doc. 132 at ¶ 37; Doc. 127-2 at 95 (352:22-353:3) (Grimes's testimony that he asked Khan "what would make the difference" between the decision to deny his paid leave request and to grant the nurses paid leave, and "he said that would probably be in your situation because he knew I was transgender"). Khan's reference to Grimes's gender identity as the basis for the denial of paid leave is evidence of discrimination. *See Deets v. Massman Constr. Co.*, 811 F.3d 978, 982

(7th Cir. 2016) (reversing summary judgment on a Title VII discrimination claim where the employer referenced the plaintiff's protected characteristic in justifying an adverse employment action). Khan's job responsibilities apparently included speaking on behalf of the County regarding Grimes's paid leave request, Doc. 127 at ¶ 53 ("Khan sent a letter to Plaintiff formally denying his request for a leave of absence … ."), so his statement provides evidence of the County's discriminatory intent. Of course, the County may offer at trial its own interpretation of Khan's statement. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("[S]ome cases permit easy inferences, such as the fabled employer who admits to firing an employee because of race. But even then factfinders must ask themselves what the admission means.").

The County argues that Grimes's discrimination claim nonetheless fails because the denial of paid leave is not an adverse employment action. Doc. 110 at 13-14; Doc. 131 at 11-12. As the court previously held, however, denial of paid leave can amount to an adverse employment action as "a diminishment of Grimes's 'compensation, benefits or other financial terms of employment.'" 455 F. Supp. 3d at 646 (quoting *Tart v. Ill. Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004)); *see Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012) ("Being forced to take an unpaid leave of absence certainly falls into the … category of material adverse employment actions" affecting "the employee's current wealth" by altering "compensation, fringe benefits, and financial terms of employment"). The County cites evidence that paid leave was not an employment benefit offered to Grimes under his collective bargaining agreement, Doc. 127 at ¶¶ 54-56, 58-59, but Khan's statement that nurses received paid leave when they faced unsafe situations indicates that such leave was an employment benefit available at the Jail, *id*. at ¶ 58; Doc. 132 at ¶ 37. A jury must resolve that conflict.

### d.  Retaliation

As for the retaliation claim, Grimes relies on a single piece of evidence: that Pryor consulted with Krasucki, the EEO Director, in connection with the denial of his paid leave request.  Doc. 129 at 15 (citing Doc. 128 at ¶ 38).  From that fact, Grimes infers that his EEO complaint motivated Pryor's decision to deny him paid leave.  *Ibid.* (citing *Carter v. Univ. of S. Ala. Children's & Women's Hosp.*, 510 F. Supp. 2d 596, 610-11 (S.D. Ala. 2007)).  But there is no evidence, or even a reasonable inference, that Pryor's consultation with Krasucki affected Pryor's decision to deny Grimes paid leave.  *Cf. Carter*, 510 F. Supp. 2d at 610 (holding that a decisionmaker's "sudden reversal of her stance toward hiring" the plaintiff after learning of a protected activity "strongly suggest[ed]" a causal connection).  Grimes's unsupported speculation regarding causation is insufficient to withstand summary judgment.  *See Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 800 (7th Cir. 2014) ("On summary judgment, this circumstantial evidence [of retaliation] must point directly to the conclusion that an employer was illegally motivated, without reliance on speculation.") (internal quotation marks omitted); *see also Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) ("Inferences that rely upon speculation or conjecture are insufficient [to survive summary judgment].").

### Conclusion

Judkins's summary judgment motion is denied.  The County's summary judgment motion is granted as to Grimes's IHRA retaliation claim and otherwise is denied.  Defendants' motion to bar Dr. Austin's opinions is granted in part and denied in part.  This case will proceed to trial on Grimes's surviving claims.

May 24, 2022

_____
United States District Judge